IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Ducere LLC, <br><br> Plaintiff, <br><br> v. <br><br> Enbridge (U.S.) Inc.; <br> Mustang Pipe Line LLC; and <br> ExxonMobil Oil Corporation <br><br> Defendants. | Case No.: _____ <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Ducere LLC ("Ducere") brings this cause of action against Defendants Enbridge (U.S.) Inc. ("Enbridge"), Mustang Pipe Line LLC ("Mustang"), and ExxonMobil Oil Corporation ("ExxonMobil") and states as follows:

### INTRODUCTION

1. It is no secret that the United States' infrastructure has choke points that can snarl the nation's supply lines in all areas of the economy. Unfortunately, the energy industry is no exception. It does not help that only a handful of companies move raw materials—like crude oil—to places where they can be turned into useful products.

2. Ducere sought to address that issue by proposing an alternate way for crude oil to get from the Chicago area to refineries along the United States' (vastly underutilized) navigable waterways, which comprise over two thirds of the United States refinery capacity. In June 2020, it approached Mustang, a joint venture between Enbridge and ExxonMobil, and proposed constructing a terminal connection to Mustang's pipeline that would allow Ducere to transport

crude on barges along the nation's domestic waterways.[1] In short, Ducere planned to offer its clients a cost-effective alternative to transporting crude oil from the Chicago area to the Gulf in Enbridge's pipelines.

3. Ducere began the expensive and time-consuming process of preparing to build that terminal, committing over $11 million to those efforts.

4. Mustang—at Enbridge's behest—abruptly reneged on their agreements without explanation, wasting three years and $11 million of Ducere's time and money.

5. Enbridge killed this vital project when it realized that Ducere's venture could result in Enbridge losing its monopoly power over crude oil transportation in the Chicago area. It directed Mustang to thwart Ducere's planned construction of a terminal connection and improperly refused to deal with Ducere on the matter.

6. This conduct represents anticompetitive behavior that violates antitrust laws. The Court should not allow Enbridge, ExxonMobil, and Mustang to use their dominance to exclude others from entering the midstream industry and providing safe, proven, cost effective energy infrastructure solutions to support the United States economy.

**PARTIES**

7. Plaintiff Ducere LLC is a limited liability company organized under the laws of Illinois with its principal place of business at 27475 Ferry Road, Suite 150, Warrenville, Illinois.

8. Defendant Enbridge (U.S.) Inc. is a Delaware corporation. Enbridge's U.S. headquarters are in Houston, Texas Suite 1100, 915 North Eldridge Parkway, Houston, TX, USA 77079.

---

[1] *See* U.S. Dep't of Tranps. Maritime Admin., *United States Marine Highway Program*, available at https://www.maritime.dot.gov/grants/marine-highways/marine-highway (last updated Dec. 1, 2023).

9. Defendant ExxonMobil Oil Corporation is incorporated under New York law and has its principal place of business at 22777 Springwoods Village Parkway, Spring, Texas.

10. Defendant Mustang Pipe Line LLC is a limited liability company organized under the laws of Delaware with its principal place of business at 22777 Springwoods Village Pkwy, Spring, Texas. Upon information and belief, Mustang's sole members are Enbridge and ExxonMobil.

## JURISDICTION AND VENUE

11. In this action, Ducere asserts violations of federal antitrust laws, including §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, against Defendants. Ducere seeks monetary and equitable relief under those laws and §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

12. Ducere also asserts claims under state law that form part of the same case or controversy as its federal antitrust claims such that this court has jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).

13. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial portion of the acts or omissions giving rise to Ducere's claim happened in this District.

## FACTUAL BACKGROUND

*The Current Infrastructure*

14. The petroleum products that make modern life possible come from crude oil. This crude oil is extracted from reserves but cannot be used by people until it is processed by refineries. In the U.S., around 75% of crude oil reaches refineries through pipelines.[2]

15. North America has vast and crucial crude oil reserves and production in North Dakota and Alberta, Canada. Enbridge owns nearly all the crude oil pipeline infrastructure in North

---

[2] *See* Energy Information Admin., *U.S. Total Refinery Receipts of Crude Oil by Method of Transportation* (June 21, 2023), available at https://www.eia.gov/dnav/pet/pet_pnp_caprec_dcu_nus_a.htm.

3

America that originates from these two places and delivers to Upper Midwest and Eastern Canada, including the Chicago area. A true and correct copy of a map of the pipeline system from Enbridge's records is below:



16. Relevant for this case, one such pipeline, known as Enbridge's Line 6, goes from Superior, Wisconsin to the Chicago area. A true and accurate map of Line 6 from Enbridge's own literature is below:

4



17. Once it enters the Chicago area, the crude oil that is not refined in the Chicago area or sent east is transported south to the Gulf Coast—almost entirely through pipelines.

18. Four pipelines leave the Chicago area and transport crude oil south.[3] Enbridge fully owns two of those pipelines. It has a majority stake in another pipeline that is minority owned by Marathon Petroleum Corporation.

19. The only pipeline leaving Chicago that Enbridge does not have at least a majority stake in is called the Mustang pipeline ("Mustang Pipeline").

20. The Mustang Pipeline is owned by Defendant Mustang, which is a joint venture between ExxonMobil and Enbridge. ExxonMobil owns 70% of the Mustang Pipeline while Enbridge owns 30%.[4]

21. Mustang is controlled by a Board consisting of two representatives from ExxonMobil and two representatives from Enbridge.

22. All Board members must agree on any major action taken by Mustang, including capital investments, debt, service changes, and operating condition changes.

---

[3] Only one pipeline transports crude oil east of the Chicago area. Enbridge entirely owns that pipeline.
[4] Mustang Pipe Line LLC, *Annual Report (FERC Form 6)* 10 (Apr. 17, 2023).

5

23. Allowing another entity to connect to and pull oil from the Mustang Pipeline qualifies as an operating condition change.

24. The Mustang Pipeline pulls crude oil from Line 6 at a junction point just north of Lockport, Illinois. From there, it heads into a terminal owned by Shell that sits near the Chicago Sanitary and Ship Canal ("Canal"). The Shell Terminal holds crude oil for storage for staging. Then, the Mustang Pipeline emerges from the Shell Terminal and heads south to Patoka, Illinois. From there, crude oil moves south to refineries in the southern Midwest and to the Gulf Coast.

*The Problem*

25. As noted above, crude oil needs to be refined for it to be usable.

26. Most North Dakota and Alberta crude oil production reaches refineries via pipelines.

27. Pipelines generally need to know how much crude oil their customers want before they start transporting crude oil through the pipeline. But sometimes refineries need more crude oil than they predict. Pipelines typically cannot supply any additional crude oil because the crude oil in the pipeline is allocated among the refineries along the line. Also, transporting more oil than anticipated through a pipeline is a cumbersome task that cannot be accomplished readily.

28. In coastal regions, refineries can obtain any additional crude oil they need by re-routing marine vessels.

29. That option (obviously) is unavailable to Midwest refineries. Instead, they typically need to obtain additional crude oil via rail. Only around 1% of crude oil is delivered via rail.[5]

30. Railing crude oil, unfortunately, is not as safe as pipelines or marine vessels. For example, a train transporting crude oil from North Dakota a refinery in New Brunswick, Canada,

---

[5] *See U.S. Total Refinery Receipts of Crude Oil by Method of Transportation*, supra note 2.

6

63 rail cars of crude oil derailed, resulting in 47 deaths and the destruction of 40 buildings and 53 vehicles.[6]

31. Using trains to transport crude oil can also be logistically tricky. Indeed, Enbridge had tried to move crude oil east from a Chicago area rail terminal in Hammond, Indiana through a subsidiary called Tidal. This venture only lasted from 2012 through 2017 because Tidal had issues meeting contractual commitments.

32. In short, crude oil supply to refineries is constricted, uneven, or both.

*The Solution*

33. One delivery option that is seldom used is moving crude along the United States' inland waterways.

34. Indeed, Congress has authorized the Secretary of Transportation to study how better using these inland waterways affects the economy.[7]

35. The Canal is part of this inland waterway system.[8] It is open to shipping year-round and is one of the northernmost points of the United States' water systems that remains open year-round.

36. The Canal flows into the Illinois River, which flows into the Mississippi River. The Mississippi River empties into the Gulf of Mexico.

37. Despite these facts, only a small amount of crude is currently being shipped on the Chicago Sanitary and Ship Canal. Ducere's proposed terminal would change that.

---

[6] Transp. Safety Bd. of Can., *Railway Investigation Report R13D0054, Runaway and Main-track Derailment, Montreal, Maine & Atlantic Railway Freight Train MMA-002 Mile 0.23, Sherbrooke Subdivision LacMeganitic, Quebec* (July 6, 2013), available at https://www.tsb.gc.ca/eng/rapports-reports/rail/2013/r13d0054/r13d0054.pdf.

[7] *See* 46 U.S.C. § 55604.

[8] Dep't of Transp. Maritime Admin., *United States Marine Highway Route Designations* 14 (Aug. 2023), https://www.maritime.dot.gov/sites/marad.dot.gov/files/2023-09/Marine%20Highway%20Route%20Descriptions%20August2023.pdf.

38. Ducere proposed building a terminal on the Canal ("Terminal"), as shown below:[9]

39. Ducere would pull crude oil from the Mustang Pipeline into its terminal and then load the crude oil onto barges, which would head south.

40. Doing so would increase the capacity for crude oil transportation as well as reduce the amount of crude oil that is needed to travel by rail.

*The Proposal*

41. In early 2020, Ducere approached Mustang about connecting Mustang's pipeline to the proposed Terminal. Because Ducere would be pulling crude oil from the Mustang Pipeline to operate the Terminal, it needed Mustang's consent.

42. Mustang expressed interest in this arrangement, but also proposed that Ducere build additional storage tanks along with the Terminal. These additional tanks would replace Shell's

---

[9] Army Corps of Eng'rs, *Chart 98 – Illinois River Miles 290.7 – 293.6* (2013), available at https://www.mvr.usace.army.mil/Portals/48/docs/Nav/NavigationCharts/ILW/CHART_97_98.pdf.

8

storage operation in Lockport. Both parties agreed to work in good faith to find solutions and address any concerns.

43. Over the next three years, Ducere invested substantial resources in preparing to build the Terminal.

44. The work began with ExxonMobil and Ducere executing a confidentiality agreement on August 11, 2020.

45. In 2021, Ducere secured a letter of interest to provide construction financing for the Terminal.

46. In 2022, Ducere obtained consultant reports, engineering reports, and market studies for the Terminal. Ducere also secured more commitments for long term financing for the Terminal, including tax-free bonds from the Joliet Regional Port District.

47. Ducere also obtained permits, secured right-of-way for the delivery pipeline, and secured an option to lease the land needed for the Terminal.

48. Ducere has committed over $11 million for all this work.

49. In August 2022, Mustang abruptly informed Ducere that it would keep using Shell's storage tanks in Lockport. But Mustang indicated that it was still willing to allow Ducere to connect to Mustang Pipeline for movements of crude oil to barges on the Canal if Ducere met certain conditions. Specifically, Mustang asked Ducere to:

    a. Find a shipper interested in utilizing the Ducere Terminal,

    b. Agree to a new Mustang proration policy[10] that provides Mustang shippers preference over Ducere shippers using both historical and haul length provisions,

---

[10] A proration policy ensures that downstream customers do not deplete a pipeline's capacity. *See* Oil Pipeline Capacity Allocation Issues and Anomalous Conditions, 87 Fed. Reg. 10,355, 10,355 (Feb. 24, 2022).

      c. Agree to provide integrity movements if the connection was idle for a period, and

      d. Agree to pay for the connection through a separate reimbursement agreement.

50. Ducere met these requirements. It found a regular Mustang shipper that expressed interest in using the Ducere Terminal and agreed to the terms proposed by Mustang.

51. At this point, in October 2022, the parties had fully negotiated agreements that were ready to be signed.

52. Mustang indicated the possibility the agreement could be executed prior to the next board meeting in November 2022. However, the Mustang Board meeting was delayed to December 2022.

53. In December 2022, the Mustang Board met but did not approve the Ducere Terminal. Instead, it reviewed some technical items at Enbridge's request.

54. Three months later, the Mustang Board declined to move forward with the Ducere Terminal.

55. Enbridge and Mustang have benefited greatly after refusing to move forward with the Terminal. Shortly after the Mustang Board vetoed the Terminal, in May 2023, Enbridge enjoyed overwhelming demand from customers to sign long-term contracts to ship crude oil on its pipelines south of the Chicago area.

56. In 2023, Mustang increased the price of oil moving through its system. While it has yet to release its profits for 2023, these price increases certainly built upon its excess profits of over $30 million in 2022.

## CAUSES OF ACTION

### Count I: Violation of § 1 of the Sherman Act
### (against all Defendants)

57. Ducere incorporates the above-recited allegations as if set forth herein.

58. A firm violates § 1 of the Sherman Act by (1) contracting, combining, or conspiring with another (2) in a way that unreasonably restrains trade in the relevant market and (3) injures the plaintiff. *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993).

59. Enbridge and ExxonMobil have contracted with each other by forming Mustang to deny others the ability to move crude oil from Alberta and North Dakota to refineries in the Midwest and Gulf Coast regions.

60. Notably, it makes little sense for Enbridge to have the right to block any action by Mustang when it only maintains a 30% ownership interest in Mustang unless ExxonMobil and Enbridge intend to prevent competitors from entering the market.

61. This contract to deny others access to crude oil pipelines constitutes a group boycott—a *per se* unreasonable restraint of trade.

62. Even if this conduct is not a *per se* unreasonable restraint of trade, it violates the rule of reason because this contract constrains the potential suppliers of crude oil, which allows Enbridge and ExxonMobil to dictate the price of oil to buyers—*i.e.*, refineries.

63. Ducere has been harmed by Defendants' conspiracy to restrain trade through its ability to connect to the Mustang Pipeline and operate the Terminal.

### Count II: Violation of § 2 of the Sherman Act
### (against all Defendants)

64. Ducere incorporates the above-recited allegations as if set forth herein.

65. A firm violates § 2 of the Sherman Act by (1) having "monopoly power in the relevant market" and (2) willfully acquiring or maintaining that monopoly power. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

66. Transporting crude oil to refineries south of the Chicago area constitutes a relevant product market and the Chicago area constitutes a relevant geographic market under antitrust laws.

67. Enbridge and Mustang maintain a monopoly over transporting crude oil south of Chicago because they control all pipelines that transport crude oil south of Chicago. Specifically, Enbridge owns at least a majority stake in three out of the four crude oil pipelines that move crude oil south of Chicago. Enbridge can veto any action by Mustang—the only pipeline of which it does not own a majority stake.

68. Defendants excluded Ducere from entering the crude oil transportation market in Chicago by refusing to allow it to build a terminal that would provide another avenue for transporting crude to refineries south of Chicago.

69. This conduct represents a refusal to allow any other competitors into the relevant market, thus injuring interstate commerce.

70. As a direct and proximate result of Enbridge and Mustang's refusal to allow Ducere to build the Terminal, Ducere suffered antitrust injuries and damages, including all costs incurred by Ducere in preparing to build the Terminal and any future profits that Ducere would have made if Enbridge and Mustang approved the Terminal.

**Count III: Impermissible Conspiracy in Restraint of Trade under the Illinois Antitrust Act (against all Defendants)**

71. Ducere incorporates the above-recited allegations as if set forth herein.

72. "[T]he Illinois Antitrust Act's prohibition of conspiracies in restraint of trade, 740 [Ill. Comp. Stat.] 10/3(1) & (2), was intentionally based on Section 1 of the Sherman Act, 15

U.S.C. § 1." *Int'l Trest & Balance, Inc. v. Associated Air & Balance Council*, 14 F. Supp. 2d 1033, 1040 (N.D. Ill. 1998).

73. Enbridge and ExxonMobil have contracted with each other through their formation of Mustang to deny others access to crude oil pipelines that move crude oil from Alberta and North Dakota to refineries in the Midwest and Gulf Coast regions.

74. Notably, it makes little sense for Enbridge to be able to block any action by Mustang when it only has a 30% ownership interest in Mustang unless ExxonMobil and Enbridge intend to prevent competitors from entering the market.

75. This contract to deny others access to crude oil pipelines constitutes a group boycott—a per *se* unreasonable restraint of trade. *See* 740 Ill. Comp. Stat. 10/3(1).

76. Even if this conduct is not a *per se* unreasonable restraint of trade, it violates the rule of reason because this contract constrains the potential suppliers of crude oil, which allows Enbridge and ExxonMobil to dictate the price of oil to buyers—*i.e.*, refineries. *See id.* 10/3(2).

77. Ducere has been harmed from Enbridge and ExxonMobil's conspiracy to restrain trade.

**Count IV: Monopolization Claim under the Illinois Antitrust Act**
**(against all Defendants)**

78. Ducere incorporates the above-recited allegations as if set forth herein.

79. A person violates the Illinois Antitrust Act by "[e]stablish[ing], maintain[ing], us[ing], or attempt[ing] to acquire monopoly power over any substantial part of trade or commerce of this State for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce…." *Id.* 10/3(3).

80. This language largely mirrors § 2 of the Sherman Act. *Hackman v. Dickerson Realtors, Inc.*, 595 F. Supp. 2d 875, 880 (N.D. Ill. 2009).

81. Transporting crude oil to refineries south of the Chicago area constitutes a relevant product market and the Chicago area constitutes a relevant geographic market under antitrust laws.

82. Enbridge and Mustang maintain a monopoly over transporting crude oil south of Chicago because they control all pipelines that transport crude oil south of Chicago. Specifically, Enbridge owns at least a majority stake in three out of the four crude oil pipelines that move crude oil south of Chicago. It can veto any action by Mustang—the only pipeline of which it does not own a majority stake.

83. Defendants excluded Ducere from entering the crude oil transportation market in Chicago by refusing to allow it to build a terminal that would provide another avenue for transporting crude to refineries south of Chicago.

84. This conduct represents a refusal to allow any other competitors into the relevant market, thus Illinois commerce.

85. As a direct and proximate result of Enbridge and Mustang's refusal to allow Ducere to build the Terminal, Ducere suffered antitrust injuries and damages, including all costs incurred by Ducere in preparing to build the Terminal and any future profits that Ducere would have made if Enbridge and Mustang had approved the Terminal connection.

### Count V: Tortious Interference of Business Expectancy
### (Enbridge only)

86. Ducere incorporates the above-recited allegations as if set forth herein.

87. Under Illinois law, the elements of a tortious interference with prospective business relationships claim are: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *McCoy v. Iberdrola Renewables, Inc.*,

760 F.3d 674, 685 (7th Cir. 2014) (quoting *Voyles v. Sandia Mortg. Corp.*, 751 N.E.2d 1126, 1133–34 (Ill. 2001)) (internal quotation marks omitted).

88. Ducere reasonably expected to enter into a valid business relationship with Mustang because:

    a. It met all Mustang's conditions for establishing the Terminal;

    b. It had prepared for years to begin building the Terminal;

    c. It secured necessary approval from governmental bodies;

    d. It has committed over $11 million preparing to build the Terminal.

89. Enbridge knew about Ducere's prospective deal with Mustang because it had two seats on Mustang's board.

90. Enbridge stopped Mustang from agreeing to Ducere's Terminal without any justification. It pressured and intimidated Mustang into not doing business with Ducere.

91. Enbridge wanted to stop the Ducere Terminal because it wanted to end any chance that Ducere and its owner, David Nelson, could compete with Enbridge. Enbridge also wanted to spite Mr. Nelson due to the deterioration of their previous relationship.

92. Ducere suffered damages as a result of Enbridge's conduct.

## DEMAND FOR JURY TRIAL

Ducere demands a jury trial on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

## PRAYER FOR RELIEF

WHEREFORE, Ducere respectfully asks the Court for the following relief:

a. Judgement entered in Ducere's favor and against Defendants in an amount to be determined by the jury at trial, including but not limited to, all actual damages, statutory damages, treble damages, and punitive damages;

b. Injunction requiring Mustang to enter into and abide by the Connection Agreement and Reimbursement Agreement terms as drafted;

c. Disgorge any and all revenues Enbridge receives from the Flanagan South Expansion Open Season;

d. Pre- and post-judgment interest at the maximum rate permitted by law;

e. All costs incurred in connection with this action, including reasonable attorneys' fees; and

f. Such other relief, at law or in equity, as this Court deems just and proper.

Respectfully submitted by,

*s/ Rex A. Sharp*
Rex A. Sharp, *pro hac vice pending*
Ike Diel, *pro hac vice pending*
Hammons Hepner, *pro hac vice pending*
Brandon C. Landt, *pro hac vice pending*
Nathan A. Kakazu, *pro hac vice pending*
SHARP LAW LLP
4820 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 901-0419 Fax
rsharp@midwest-law.com
idiel@midwest-law.com
hhepner@midwest-law.com
blandt@midwest-law.com
nkakazu@midwest-law.com