**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DUCERE, LLC, | |
| *Plaintiff*, | |
| v. | Case No. 1:24-CV-01217 |
| ENBRIDGE (U.S.) INC., MUSTANG PIPE LINE LLC, AND EXXONMOBIL OIL CORPORATION, | Honorable John F. Kness |
| *Defendants*. | |

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS**

---

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 2

STANDARD OF REVIEW ...................................................................................... 3

ARGUMENT ........................................................................................................... 3

I.      THE COMPLAINT RELIES ON IMPERMISSIBLE GROUP PLEADING .................. 3

II.      THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE A SECTION 2 VIOLATION .......................................................................................................... 4

     A.      The Section 2 count fails to define a cognizable "relevant market." ..................... 5

     B.      The Section 2 count fails to allege a monopoly. .................................................. 6

     C.      Defendants have no duty to deal with Plaintiff. ................................................... 8

III.      THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE A SECTION 1 VIOLATION ........................................................................................................ 10

     A.      The Complaint does not adequately allege concerted action in violation of Section 1 ........................................................................................................ 11

         1.      Plaintiff's challenge to the formation of the joint venture attacks lawful conduct and is time-barred .......................................................... 11

         2.      Plaintiff's claims still fail if the alleged violation is based on one member's alleged ability to block or veto ............................................... 13

     B.      The Complaint does not adequately allege unreasonable restraint of trade in a defined market in violation of Section 1 ........................................................ 15

         1.      Plaintiff's Section 1 claim should be analyzed under the rule of reason. .................................................................................................... 15

         2.      The Section 1 count fails to allege an unreasonable restraint of trade in the relevant market as required under a rule of reason analysis .................................................................................................. 17

IV.      PLAINTIFF LACKS ANTITRUST STANDING ........................................................ 19

V.      THE STATE LAW ANTITRUST CLAIMS PARALLEL THE FEDERAL CLAIMS ............................................................................................................... 22

VI.      THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE TORTIOUS INTERFERENCE AGAINST ENBRIDGE ................................................................ 23

     A.      Plaintiff's tortious interference claim should be dismissed because it is based on the same alleged conduct as Plaintiff's failed antitrust claims. ........... 23

     B.      Enbridge was privileged to reject Plaintiff's business proposal on behalf of Mustang, a company Enbridge owns and manages. ........................................... 24

i

C.    The competitor's privilege also shields Enbridge from tortious interference liability because the challenged conduct simply reflects Enbridge competing.............................................................................................. 25

D.    Plaintiff has not adequately pled the elements of a tortious interference claim........................................................................................................ 26

CONCLUSION............................................................................................................. 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3Com Corp. v. Elec. Recovery Specialists, Inc.*,
  104 F. Supp. 2d 932 (N.D. Ill. 2000) ...............................................................24, 25

*Agnew v. NCAA*,
  683 F.3d 328 (7th Cir. 2012) ...............................................................................19

*Am. Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010) ...............................................................................11, 13, 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................3, 12, 27

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)...............................................................................9, 10

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*,
  15 F.4th 831 (7th Cir. 2021) ...............................................................................11

*Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)...............................................................................19, 21

*Ball Mem'l Hosp. v. Mut. Hosp. Ins.*,
  784 F.2d 1325 (7th Cir. 1986) ...............................................................................19

*Bank of Am., N.A. v. Knight*,
  725 F.3d 815 (7th Cir. 2013) ...............................................................................3, 4

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................11

*Besser Publ'g. Co. v. Pioneer Press, Inc.*,
  571 F. Supp. 640 (N.D. Ill. 1983) ...............................................................................6

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995) ...............................................................................6

*Borsellino v. Goldman Sachs Grp., Inc.*,
  477 F.3d 502 (7th Cir. 2007)...............................................................................26, 27

*Brodsky v. HumanaDental Ins. Co.*,
  No. 10-cv-3233, 2014 WL 2780089 (N.D. Ill. Jun. 12, 2014) ...................................2

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)...............................................................................................20

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)............................................................................................1, 21

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)...............................................................................................20

*Brunswick Corp. v. Riegel Textile Corp.*,
752 F.2d 261 (7th Cir. 1984) .................................................................................12

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
485 U.S. 717 (1988)...............................................................................................15

*Car Carriers, Inc. v. Ford Motor Co.*,
745 F.2d 1101 (7th Cir. 1984) ..........................................................................19, 21

*Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
961 F.2d 667 (7th Cir. 1992) .................................................................................21

*Chi. Pro. Sports v. Nat'l Basketball Ass'n*,
754 F. Supp. 1336 (N.D. Ill. 1991) ........................................................................10

*Collins v. Associated Pathologists, Ltd.*,
844 F.2d 473 (7th Cir. 1988) ...................................................................................5

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
433 U.S. 36 (1977)..................................................................................................16

*Contractor Util. Sales Co. v. Certain-Teed Prod. Corp.*,
638 F.2d 1061 (7th Cir. 1981) ................................................................................21

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984)..................................................................................11, 12, 14, 15

*D'Last Corp. v. Ugent*,
863 F. Supp. 763 (N.D. Ill. 1994) ..........................................................................14

*Denny's Marina, Inc. v. Renfro Prods., Inc.*,
8 F.3d 1217 (7th Cir. 1993) ....................................................................................11

*Elliott v. United Ctr.*,
126 F.3d 1003 (7th Cir. 1997) ..................................................................................5

*In re Fico Antitrust Litig. Related Cases*,
No. 1:20-cv-02114, 2023 WL 6388247 (N.D. Ill. Sept. 28, 2023)............................5

iv

*Fid. Nat'l Title Ins. Co. v. Westhaven Props. P'ship*,
    898 N.E.2d 1051 (Ill. App. Ct. 2007) .....................................................................27

*Fisher v. Aurora Health Care, Inc.*,
    558 F. App'x 653 (7th Cir. 2014) ..........................................................................22

*Fishman v. Estate of Wirtz*,
    807 F.2d 520 (7th Cir. 1986) ...............................................................................18

*Greater Rockford Energy v. Shell Oil*,
    998 F.2d 391 (7th Cir. 1993) ..................................................................19, 20, 22

*Green Light Nat'l LLC v. Kent*,
    No. 17-cv-6370, 2018 WL 4384298 (N.D. Ill. Sept. 14, 2018)........................24, 25

*Hackman v. Dickerson Realtors, Inc.*,
    520 F. Supp. 2d 954 (N.D. Ill. 2007) .....................................................................27

*Hackman v. Dickerson Relators, Inc.*,
    595 F. Supp. 2d 875 (N.D. Ill. 2009) .....................................................................23

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
    No. 11-cv-07834, 2014 WL 6845862 (N.D. Ill. Dec. 4, 2014)..............................23

*JamSports & Ent., LLC v. Paradama Prods.*,
    382 F. Supp. 2d 1056 (N.D. Ill. 2005) ...................................................................23

*Kentmaster Mfg. Co. v. Jarvis Prods. Corp.*,
    146 F.3d 691 (9th Cir. 1998) ...............................................................................24

*Kochert v. Greater Lafayette Health Servs., Inc.*,
    463 F.3d 710 (7th Cir. 2006) ...............................................................................20

*Koehler v. Packer Grp., Inc.*,
    53 N.E.3d 218 (Ill. App. Ct. 2016) ........................................................................27

*Laughlin v. Evanston Hosp.*,
    133 Ill. 2d 374 (1990) ..........................................................................................22

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ...............................................................................20

*Lorain J. Co. v. United States*,
    342 U.S. 143 (1951)..............................................................................................10

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
    641 F.3d 834 (7th Cir. 2011) .................................................................................8

*Midwest Gas Servs., Inc. v. Ind. Gas Co., Inc.*,
  317 F.3d 703 (7th Cir. 2003) ...................................................................................7

*Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*,
  596 F. Supp. 3d 1076 (N.D. Ill. 2022) ...................................................................19

*MSP Recovery Claims, Series LLC v. Mallinckrodt ARD Inc.*,
  No. 18 C 00379, 2019 WL 11658793 (N.D. Ill. Jan. 25, 2019) ..............................4

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
  435 U.S. 679 (1978)..............................................................................................10

*Nation v. Am. Cap., Ltd.*,
  682 F.3d 648 (7th Cir. 2012) ................................................................................24

*NCAA v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984)................................................................................................16

*Nelson v. Monroe Reg'l Med. Ctr.*,
  925 F.2d 1555 (7th Cir. 1991) ...............................................................1, 20, 21, 22

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*,
  472 U.S. 284 (1985)..............................................................................................16

*NYNEX Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998)..............................................................................................15

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)..............................................................................................18

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
  555 U.S. 438 (2009)................................................................................................9

*Quality Auto Body, Inc. v. Allstate Ins. Co.*,
  660 F.2d 1195 (7th Cir. 1981) ...............................................................................17

*Riley v. Info. Sys. Audit and Control Ass'n, Inc.*,
  No. 22-cv-4465, 2023 WL 3997075 (N.D. Ill. Jun. 14, 2023) ...............................18

*Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*,
  40 F.3d 247 (7th Cir. 1994) ..................................................................................18

*Scherr v. Marriott Int'l*,
  703 F.3d 1069 (7th Cir. 2013) ...............................................................................13

*People ex rel. Scott v. Coll. Hills Corp.*,
  91 Ill.2d 138 (1982) ..............................................................................................22

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
  950 F.3d 911 (7th Cir. 2020) ...........................................................................6, 9

*Soderlund Bros. v. Carrier Corp.*,
  663 N.E.2d 1 (Ill. App. Ct. 1995) ........................................................................25

*Speakers of Sport, Inc. v. ProServ, Inc.*,
  178 F.3d 862 (7th Cir. 1999) .........................................................................25, 26

*St. Charles Riverfront Station Inc. v. Empress Casino Joliet Corp.*,
  5 F. Supp. 2d 592 (N.D. Ill. 1998) ......................................................................27

*Standard Oil Co. v. United States*,
  221 U.S. 1 (1911).................................................................................................10

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
  No. CV F 09-0560, 2010 WL 3521979 (E.D. Cal. Sept. 3, 2010)...................12, 13

*In re Sulfuric Acid Antitrust Litig.*,
  703 F.3d 1004 (7th Cir. 2012) .............................................................................16

*Tamburo v. Dworkin*,
  601 F.3d 693 (7th Cir. 2010) ..............................................................................23

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961)...............................................................................................5

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006)......................................................................................12, 14, 15

*U.S. Trotting Ass'n v. Chi. Downs Ass'n, Inc.*,
  665 F.2d 781 (7th Cir. 1981) ...............................................................................16

*United States v. E. I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956)................................................................................................5

*United States v. Topco Assocs.*,
  405 U.S. 596 (1972)..............................................................................................15

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
  No. 14-cv-00804, 2015 WL 5693735 (N.D. Ill. Sept. 28, 2015).............................2

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004).................................................................................... *passim*

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ............................................................................1, 8

*Vuciecevic v. MacNeal Mem'l. Hosp.*,
    572 F. Supp. 1424 (N.D. Ill. 1983) ...................................................................16

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
    382 U.S. 172 (1965) ...........................................................................................5

*Williamson v. Curran*,
    714 F.3d 432 (7th Cir. 2013) ...........................................................................13

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*,
    536 F.3d 663 (7th Cir. 2006) ...........................................................................23

*Wood v. Worachek*,
    618 F.2d 1225 (7th Cir. 1980) ...........................................................................2

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016) ...............................................................7

## Statutes

15 U.S.C. § 15b .......................................................................................................12

Illinois Antitrust Act, 740 ILCS 10 *et seq.* ....................................................22, 23

Sherman Act, 15 U.S.C. § 1 *et seq.* ............................................................. *passim*

## Other Authorities

Antitrust Law and Trade Regulation (2d. Ed. 2024) .................................................9

Federal Rule of Civil Procedure 12(b)(6) ...............................................................1

Marina Lao, *Aspen Skiing and Trinko: Antitrust Intent and "Sacrifice,"* 73
    ANTITRUST L.J. 171 (2005)...............................................................................9

Pursuant to Federal Rule 12(b)(6), Defendants Mustang Pipe Line LLC ("Mustang"), Enbridge (U.S.) Inc. ("Enbridge"), and ExxonMobil Oil Corporation ("ExxonMobil") (collectively "Defendants"), by and through their undersigned counsel, hereby submit their Memorandum of Law in Support of their Motion to Dismiss:[1]

## INTRODUCTION

The most fundamental tenet of the antitrust laws is that they protect "competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). Companies are "free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 454 (7th Cir. 2020) (internal citation omitted). No failed competitor is entitled to a remedy under antitrust law merely because a rival declined to contract with it or negotiations foundered. Indeed, it is "the public injury to competition, not the private injury to single individuals, that is addressed by the antitrust laws." *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1577 (7th Cir. 1991) (Pell, J., concurring in part). Otherwise, courts would be forced to "act as central planners, identifying the proper price, quantity, and other terms of dealing." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). This is a role, Justice Scalia rightly noted, "for which they are ill suited." *Id.*

Yet, the transformation of an unsuccessful business proposal into a violation of federal antitrust law is precisely what Plaintiff seeks from this Court. Plaintiff proposed a business venture with Mustang, which Mustang considered, in good faith, before ultimately declining to pursue the project based on its considered judgment. This is a routine, everyday occurrence in the business world and, while Plaintiff may be disappointed in Mustang's decision, the mere rejection of a

---

[1] All Defendants join this motion to dismiss in full. In addition, Defendant ExxonMobil will file a separate motion to dismiss addressing the allegations against it, specifically.

business deal does not give rise to an antitrust action. This is because "[a]ntitrust law does not authorize courts (or disappointed bidders) to impose their business judgments on market players." *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, No. 14-cv-00804, 2015 WL 5693735, at *9 (N.D. Ill. Sept. 28, 2015).

Notably, Plaintiff does *not* allege that any Defendant breached any contractual obligation to it—Plaintiff's sole complaint is that one or more of the Defendants refused its business proposal. This is not enough to establish a violation of the antitrust laws. Without more, Plaintiff's claims are inadequate as a matter of law and must be dismissed.

## **BACKGROUND**

This case involves a proposal to transport crude oil using inland waterways near Chicago.[2] Crude oil is extracted from reserves but it cannot be used until it is processed by refineries. Compl. ¶ 14. About 75% of crude oil is transported to refineries through pipelines, with any additional crude oil transported via rail. Compl. ¶¶ 14, 29. The Complaint alleges that there are four pipelines that leave the Chicago area and transport crude oil south. Compl. ¶ 18. According to the Complaint, Enbridge owns two of those pipelines, and has a majority stake in a third pipeline. Compl. ¶ 18. The fourth pipeline is owned by Mustang. Compl. ¶¶ 19–20. Plaintiff alleges that Mustang is a joint venture between Enbridge and ExxonMobil, and that "ExxonMobil owns 70% of the Mustang Pipeline while Enbridge owns 30%." Compl. ¶ 20.[3]

---

[2] The facts set forth herein are based on Plaintiff's Complaint, which must be accepted as true. Nothing in this Motion is intended to concede the truth of any alleged fact.

[3] Mustang is actually a joint venture owned by Mobil Illinois Pipe Line Company and Enbridge Holdings (Mustang) Inc. *See* Corporate Disclosure Statement of Mustang Pipe Line LLC, No. 1:24-cv-01217, Dkt No. 20. Plaintiff's error in naming the wrong corporate entities requires dismissal. *See Wood v. Worachek*, 618 F.2d 1225, 1229 (7th Cir. 1980) (noting that while a plaintiff may amend his complaint under Rule 15(c) to correct a misnomer of plaintiff where the proper party plaintiff is already in court, "a new defendant cannot normally be substituted or added by amendment"); *Brodsky v. HumanaDental Ins. Co.,* No. 10-cv-3233, 2014 WL 2780089, at *5 (N.D. Ill. Jun. 12, 2014) (discussing a case where the plaintiff sought to

In June 2020, Plaintiff approached Mustang—a preexisting joint venture—with a business proposal for an alternate way, other than pipeline and rail, to transport crude oil from the Chicago area to refineries in southern states. Compl. ¶ 2. Plaintiff proposed moving additional crude oil along the United States' inland waterways. Compl. ¶ 33. By its own admission, this method is "seldom used" and its economic impact is unknown. *See* Compl. ¶¶ 33–34. Plaintiff's proposal would have required the construction of a terminal connection to Mustang's pipeline. Compl. ¶ 2. Plaintiff would then pull crude oil from Mustang's pipeline into its terminal and load the crude oil on barges that would head south. Compl. ¶ 39. Plaintiff and Mustang entered into discussions, and Mustang ultimately declined Plaintiff's proposal in early 2023. Compl. ¶ 54.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## ARGUMENT

## I.     THE COMPLAINT RELIES ON IMPERMISSIBLE GROUP PLEADING

A plaintiff must make sufficient allegations against each and every defendant. *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013). "Group pleadings," which impermissibly

---

substitute a new defendant and noting that the court had stated "plaintiffs [sic] proper course of action would be to file a new action against the new defendant"). Therefore, Plaintiff's claims should be dismissed as to Enbridge (U.S.) Inc. and ExxonMobil Oil Corporation on this ground.

lump allegations against multiple defendants together, are insufficient to survive a motion to dismiss. *MSP Recovery Claims, Series LLC v. Mallinckrodt ARD Inc.*, No. 18 C 00379, 2019 WL 11658793, at *1 n.4 (N.D. Ill. Jan. 25, 2019) ("'[G]roup pleading'—where a plaintiff's allegations simply lump defendants together without describing which defendant is responsible for what conduct or when each defendant participated in that unspecified conduct—is insufficient at the motion-to-dismiss stage."). A plaintiff must instead plead facts specific to the conduct of each defendant and thereby provide notice to each defendant of the allegations against it. *Knight*, 725 F.3d at 818 ("Each defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of collective responsibility must be dismissed.").

Plaintiff's Complaint, however, fails to plead specific facts as to each Defendant or to articulate exactly what conduct, and by whom, was anticompetitive. For example, the Complaint describes ExxonMobil as a member of the Mustang joint venture, but includes zero allegations about ExxonMobil engaging in any anticompetitive conduct. Compl. ¶ 20. As discussed in more depth below, *see infra* Section II.A, II.B, III.A, III.B, neither the conduct alleged to be anticompetitive nor the responsible party is sufficiently identified. This lack of clarity hardly provides adequate notice to each Defendant of "what he or she did that is asserted to be wrongful" as required by *Knight.* As a threshold matter, therefore, Plaintiff's Complaint should be dismissed for failure to state a claim as to each, or indeed any, of the Defendants.

## II.   THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE A SECTION 2 VIOLATION

To state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must plead that a defendant: (1) "possess[es] monopoly power in the relevant market" and (2) engages in "the willful acquisition or maintenance of that power." *Trinko,* 540 U.S. at 407–08 (internal

citation omitted). Here, Plaintiff failed to adequately plead either element, and therefore its Section 2 claims must be dismissed.

### A.     The Section 2 count fails to define a cognizable "relevant market."

Under Section 2, "monopoly power in a defined market must be sufficiently alleged for the Plaintiffs to survive a motion to dismiss." *In re Fico Antitrust Litig. Related Cases*, No. 1:20-cv-02114, 2023 WL 6388247, at *4 (N.D. Ill. Sept. 28, 2023). This requires defining the relevant market. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) ("To establish monopolization … under § 2 of the Sherman Act, it would then be necessary to appraise the exclusionary power of the [alleged anticompetitive conduct] in terms of the relevant market for the product involved. Without a definition of that market there is no way to measure [Defendant's] ability to lessen or destroy competition."). Failure to allege a plausible market requires dismissal of Sherman Act claims. *See, e.g.*, *Elliott v. United Ctr.*, 126 F.3d 1003, 1004–05 (7th Cir. 1997).

As a threshold matter, a plaintiff alleging monopolization must identify both (1) the relevant product market or "line of commerce" and (2) the relevant geographic market "by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).[4] According to Plaintiff, the relevant market here is "[t]ransporting crude oil to refineries south of the Chicago area." Compl. ¶ 66. This definition fails as a matter of law for several reasons.

First, Plaintiff fails to address the availability of any reasonably interchangeable substitutes, which define the relevant product market. *See United States v. E. I. du Pont de*

---

[4] "Although *Tampa Electric* was brought under Section 3 of the Clayton Act, courts routinely rely on its analysis for cases arising under Sections 1 and 2 of the Sherman Act." *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 478 n.4 (7th Cir. 1988).

*Nemours & Co.*, 351 U.S. 377, 404 (1956) ("The 'market' which one must study to determine when a producer has monopoly power … is composed of products that have reasonable interchangeability for the purposes for which they are produced."); *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 918 (7th Cir. 2020) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes." (quoting *Brown Shoe Co.*, 370 U.S. at 325)). For example, Plaintiff does not account for other acknowledged methods of transportation of crude oil, such as rail, trucks, and even inland waterways, and the degree to which they are reasonably interchangeable. Compl. ¶¶ 29–31.

Second, Plaintiff fails to explain the geographical boundaries of this alleged market beyond the generalized term "south of Chicago." *See Besser Publ'g. Co. v. Pioneer Press, Inc.*, 571 F. Supp. 640, 641 (N.D. Ill. 1983) (rejecting a geographic market definition of "north, northwestern and western suburbs of Chicago" as "simply too vague"). Indeed, this geographic definition of the relevant market is virtually boundless. Plaintiff does not give any hint as to where this product market starts or ends, or why it is even limited to the Chicago area alone.

### B. The Section 2 count fails to allege a monopoly.

Even if one accepts Plaintiff's proffered market definition as pled, Plaintiff has failed to adequately allege a monopoly over the market so defined. Mustang represents only one of four pipelines in the area, Compl. ¶¶ 18-19, and there is no allegation regarding how much share each of these four pipelines has in the relevant market, or how much the pipelines have relative to alternative modes of transportation. Accordingly, the Complaint contains no information that would suggest that the single Mustang pipeline possesses adequate market share to constitute a monopoly. *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1411 (7th Cir. 1995) ("Fifty percent is below any accepted benchmark for inferring monopoly power

from market share"); *see also Tampa Electric*, 365 U.S. at 328–29 (requiring an effect on competition in a "substantial share" of the relevant market).

Plaintiff likewise cannot save its Section 2 count by group pleading market power allegations against "all Defendants." The only allegation of monopolization is a conclusory allegation that "Enbridge *and* Mustang maintain a monopoly over transporting crude oil south of Chicago." Compl. ¶ 67 (emphasis added). But a Section 2 claim "can only accuse one firm of being a monopolist." *Midwest Gas Servs., Inc. v. Ind. Gas Co., Inc.*, 317 F.3d 703, 713 (7th Cir. 2003); *see In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 382–83 (S.D.N.Y. 2016) ("[N]umerous district courts … have repeatedly rejected the viability of a Section 2 conspiracy claim based on a shared monopoly theory.") (collecting cases).

The Seventh Circuit has addressed this scenario previously. In *Midwest Gas Services*, the plaintiffs alleged, *inter alia*, that two defendants—a natural gas utility and a gas marketer, which was a 50/50 joint venture between the defendant gas utility and another gas utility—maintained a monopoly in the distribution and transportation of natural gas. 317 F.3d at 713. The *Midwest Gas Services* plaintiffs claimed a monopoly existed because the joint venture gas marketer was functionally controlled by the gas utility. *Id*. The Seventh Circuit rejected this argument, holding that the joint venture was "an entity separate and distinct from [the gas utility company]" and thus plaintiff could not bring its claims under Section 2. *Id.*

Here, Plaintiff attempts to create a monopoly by lumping together Enbridge and Mustang as if they are a single company. Yet, the Complaint itself concedes that they are separate entities. Compl. ¶¶ 8, 10.[5] Given that Plaintiff's allegations of monopoly rely on two separate firms, its claim must fail.

---

[5] Additionally, while Plaintiff brings this claim against all Defendants, no mention is made of ExxonMobil.

**C.      Defendants have no duty to deal with Plaintiff.**

Plaintiff has also failed to allege that Defendants engaged in the willful acquisition or maintenance of their alleged monopoly power.  To establish this, Plaintiff must plead that Defendants "engaged in predatory or anticompetitive conduct of some kind." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011).  The Complaint points to only one act taken by Defendants that allegedly constitutes anticompetitive conduct required for any Section 2 violation: namely, that Defendants "excluded" Plaintiff from the market when Mustang did not agree to Plaintiff's proposal to build a terminal to connect to Mustang's pipeline.  Compl. ¶ 68. Such an allegation, as a matter of law, does not state a claim under Section 2 because companies "are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *Viamedia, Inc.*, 951 F.3d at 454 (internal quotations and citations omitted).

Plaintiff is essentially arguing that Mustang was legally required to begin a new business venture with a potential competitor, but the antitrust laws impose no such obligation.  *See Trinko*, 540 U.S. 398.  In *Trinko*, the plaintiff alleged that the defendant violated Section 2 when it denied its interconnection services to rivals in order to limit entry into the market.  *Id.* at 407.  The Supreme Court dismissed the plaintiff's complaint, concluding that "[c]ompelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities."  *Id.* at 407–08.  Writing for the Supreme Court, Justice Scalia warned that compelling a firm into enforced sharing between competitors would require courts to act as "central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited."  *Id.* at 408.

The Sherman Act simply does not impose a duty on Defendants to assist their competitors, and thus Defendants' alleged failure to participate in Plaintiff's proposed business venture in the manner alleged in the Complaint in no way violates the antitrust laws. *See Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 450–51 (2009) (holding that a "firm with no duty to deal in the wholesale market has no obligation to deal under terms and conditions favorable to its competitors"); *Sharif Pharmacy*, 950 F.3d at 916 (concluding that Section 2 "allows even firms with monopoly power to choose with whom they deal and on what terms and conditions").

There may (or may not) still be one limited exception to the generally well-settled principle that a firm has a right to refuse to deal with its competitors. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985).[6] In *Aspen Skiing*, the defendant operated three of the four ski locations in Aspen, Colorado while the plaintiff operated the remaining location. For many years, the parties had jointly offered an "All-Aspen" ticket that allowed customers access to all four mountains operated by the two different ski companies. *Id.* at 589–95. After several disputes regarding revenue sharing, however, the *Aspen Skiing* defendant unilaterally refused to continue with the joint agreement; it "took additional actions that made it extremely difficult for [plaintiff] to market its own multi area package to replace the joint offering," and refused to sell its ticket at retail price to the plaintiff. *Id.* at 593. In sustaining a monopolization verdict for the plaintiff, the Supreme Court emphasized that "the monopolist did not merely reject a novel offer to participate in a cooperative venture that had been proposed by a competitor. Rather, the

---

[6] "The scope of a monopolist's duty to deal with its rivals was mostly put to rest by the Supreme Court's decision in *Trinko*" and the Court "effectively limited *Aspen Skiing* to its particular facts." 2 Antitrust Law and Trade Regulation § 25.04 (2d. Ed. 2024). Indeed, "it is difficult to know … what is left of *Aspen*… after the Supreme Court's decision … in…*Trinko*." Marina Lao, *Aspen Skiing and Trinko: Antitrust Intent and "Sacrifice,"* 73 ANTITRUST L.J. 171, 172 (2005).

monopolist elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years." *Id.* at 603.

The Supreme Court has made clear that the *Aspen Skiing* exception is "at or near the outer boundary of § 2 liability" and should be applied with great caution "because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct." *Trinko*, 540 U.S. at 408-09. But, even assuming arguendo that *Aspen Skiing* is still good law, Plaintiff has made no attempt to establish any of the factual predicates necessary to invoke this exceedingly narrow exception. And, "[i]n the absence of any purpose to create or maintain a monopoly, [Section 2] does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Lorain J. Co. v. United States*, 342 U.S. 143, 155 (1951) (internal citation omitted).

## III.  THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE A SECTION 1 VIOLATION

Section 1 of the Sherman Act proscribes "[e]very contract, combination…or conspiracy…in restraint of trade or commerce." 15 U.S.C. § 1. "[R]ead literally, § 1 would outlaw the entire body of private contract law," *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 688 (1978), and "outlaw[ing] every contract" would be "nonsensical." *Chi. Pro. Sports v. Nat'l Basketball Ass'n*, 754 F. Supp. 1336, 1351 (N.D. Ill. 1991), *aff'd*, 961 F.2d 667 (7th Cir. 1992). Therefore, the Supreme Court has limited Section 1 to prohibit only *unreasonable* restraints. *Standard Oil Co. v. United States*, 221 U.S. 1 (1911). Thus, under Section 1, the Court "is confined to a consideration of impact on competitive conditions." *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 690. Specifically, a plaintiff must prove three elements: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an

accompanying injury." *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993). The Complaint fails to plausibly allege any of these elements.

A plaintiff alleging an antitrust conspiracy in violation of Section 1 must come forward with factual allegations "plausibly suggesting (not merely consistent with) agreement" to survive a motion to dismiss. *Twombly*, 550 U.S. at 557. Conclusory allegations—for example, that defendants "'agreed,' 'colluded,' or 'induced' agreement, conspiracy, or collusion"—"cannot substitute for factual allegations" and will be disregarded. *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 834 (7th Cir. 2021) (holding that plaintiff did not state a plausible claim under Sherman Act).

## A. The Complaint does not adequately allege concerted action in violation of Section 1.

The first element—"a contract, combination, or conspiracy"—requires "concerted action" between parties. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010); *see also Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767 (1984) (recognizing that Section 1 makes a "basic distinction between concerted and independent action"). But "[n]ot every instance of cooperation between two people is a potential 'contract, combination ..., or conspiracy, in restraint of trade.'" *Am. Needle*, 560 U.S. at 189–90 (quoting 15 U.S.C. § 1); *see also id.* at 186 ("The question whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade."). Here, Plaintiff fails to clearly articulate both *who* is responsible for the alleged anticompetitive conduct and *what* exactly is the objectionable "contract, combination, or conspiracy."

### 1. *Plaintiff's challenge to the formation of the joint venture attacks lawful conduct and is time-barred.*

Plaintiff's primary theory appears to be that the alleged contract, combination, or conspiracy is the formation of the Mustang joint venture itself. Compl. ¶ 59. But the mere

formation of a joint venture, without more, is not inherently anticompetitive. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006); *Copperweld*, 467 U.S. at 768 ("[J]oint ventures . . . hold the promise of increasing a firm's efficiency and enabling it to compete more effectively."). Furthermore, it is implausible in the extreme to contend that two companies formed a joint venture just to deny others access to the joint venture. Indeed, by definition, *every* joint venture necessarily excludes those that are not party to the venture and, without more, there is no basis to infer conspiracy from ordinary business transactions. Plaintiff has thus entirely failed to plead facts "that allow[] the court to draw the reasonable inference" that Mustang constitutes a contract, combination, or conspiracy in violation of Section 1. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

Moreover, to the extent this is Plaintiff's theory, Plaintiff's claim is time-barred. A plaintiff filing suit under the Sherman Act must do so "within four years after the cause of action has accrued." 15 U.S.C. § 15b. "Where the allege[d] antitrust injury is caused by a single act, the statute of limitations begins to run at the time the injurious act was committed, even if the act inflicts injury over a prolonged period of time." *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, No. CV F 09-0560, 2010 WL 3521979, at *13 (E.D. Cal. Sept. 3, 2010) ("[T]he statute of limitations runs from the commission of the injurious act rather than from the recognition of the resulting injury." (citing *Zenith Radio Corp. v. Hazeltine Rsch.*, 401 U.S. 321, 338–339 (1971))); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 268 (7th Cir. 1984) (affirming dismissal of a Sherman Act claim because the statute of limitations began to run when the defendant obtained the allegedly fraudulent patent that excluded the plaintiff from the market).

Here, the alleged anticompetitive conduct is the formation of the joint venture in 1996,[7] and the statute of limitations expired long ago. *See* Mustang Pipe Line LLC, Annual Report (FERC

---

[7] The Complaint does not even allege (nor can it) that both current Members of Mustang—Enbridge and ExxonMobil—were Members of the joint venture at the time of its formation in 1996.

Form 6) at 8 (Apr. 17, 2023).[8] *Stanislaus Food* is directly on point. In that case, the plaintiff claimed that the defendants had violated Section 1 through a joint venture created decades earlier. The court dismissed the claim as time-barred because "plaintiff undoubtedly challenges [the venture's] formation as a restraint of trade and a conspiracy" and that act "occurred but one, single time, in 1986." *Stanislaus Food*, 2010 WL 3521979, at *17. For the same reason, Plaintiff's Section 1 claim should be dismissed as untimely.

2. ***Plaintiff's claims still fail if the alleged violation is based on one member's alleged ability to block or veto.***

Plaintiff also alleges that "any major action taken by Mustang"—including approval of Plaintiff's business proposal—requires unanimous agreement amongst all four representatives of Mustang's Board, which "consist[s] of two representatives from ExxonMobil and two representatives from Enbridge." Compl. ¶¶ 21–23. According to the Complaint, this structure afforded Mustang's members "the right to block" or "veto" any action taken by Mustang. *See* Compl. ¶¶ 60, 67. To the extent that Plaintiff is alleging that the "concerted action" in this case is not the formation of the joint venture, but rather a Member's ability to block or veto while acting in its capacity as an owner and Board[9] member of Mustang, this too fails because independent, unilateral action—such as an owner's exercise of its veto right—is not cognizable under Section 1. *Am. Needle*, 560 U.S. at 190 (There is a "basic distinction in the Sherman Act between concerted

---

[8] Because Plaintiff relies on this Annual Report in the Complaint (for ExxonMobil's ownership interest in Mustang), *see* Compl. ¶ 20 n.4, and it is a matter of public record, the Court may consider it on a motion to dismiss. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) (recognizing that the " court may consider … documents that are central to the complaint and are referred to in it"); *Scherr v. Marriott Int'l*, 703 F.3d 1069, 1073 (7th Cir. 2013) (courts "may take judicial notice of documents that are part of the public record") (citing *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1080-81 (7th Cir. 1997)).

[9] As alleged in the Complaint, "Mustang is controlled by a Board consisting of two representatives from ExxonMobil and two representatives from Enbridge." Compl. ¶ 21. Mustang refers to this body as its "Representative Committee." For purposes of this Motion, references to Mustang's "Board" pertain to the Representative Committee.

and independent action that distinguishes § 1 of the Sherman Act from § 2. Section 1 applies only to concerted action that restrains trade.") (cleaned up). Courts have held that actions taken by a joint venture constitute unilateral conduct—not concerted action or agreement between the joint venture owners. *Texaco*, 547 U.S. at 6–7 (finding that actions taken by joint venture reflected decisions made by a "single entity," not an agreement between two competitors).

Even if the alleged veto power were construed as an agreement between Mustang and one of its Members, rather than an independent action, it does not constitute concerted action because the "key" to concerted action is "whether it joins together separate decisionmakers." *Am. Needle*, 560 U.S. at 195; *Copperweld*, 467 U.S. at 769.

In *Copperweld*, the Supreme Court considered whether a parent and wholly owned subsidiary were capable of conspiring for the purposes of Section 1 and ultimately held that they were not. 467 U.S. at 777. The Court adopted a context-dependent analysis, where "substance, not form, should determine whether a separately incorporated entity is capable of conspiring under § 1" and decided the "coordinated behavior of a parent and its wholly owned subsidiary" was subject to the same logic that exempted unilateral conduct from Section 1 scrutiny. *Id.* at 773 n.21, 776. Lower courts have since applied the *Copperweld* rule to additional contexts. *See, e.g.*, *D'Last Corp. v. Ugent*, 863 F. Supp. 763, 768 (N.D. Ill. 1994), *aff'd*, 51 F.3d 275 (7th Cir. 1995) (*Copperweld*'s "rationale—essentially that a conspiracy with oneself is conceptually impossible…compels the same result" in the context of multiple corporations with common ownership). And the Supreme Court reaffirmed that it applies even to legally distinct entities in *American Needle*. *Am. Needle*, 560 U.S. at 192; *see also id.* at 195 ("The relevant inquiry, therefore, is whether there is a 'contract, combination …, or conspiracy' amongst 'separate

economic actors pursuing separate economic interests' … such that the agreement 'deprives the marketplace of independent centers of decisionmaking.'") (internal citation omitted).

Here, Plaintiff contends that Enbridge has the right to block any action by Mustang, Compl. ¶ 60, but again, Enbridge is a Member of the Mustang joint venture, Compl. ¶¶ 20–23. Therefore, where a Member is exercising its voting rights in Mustang through its Board membership, the Member and Mustang are not wholly "separate economic actors pursuing separate economic interests," and such Board votes (or vetoes) do not constitute "concerted action" within the meaning of Section 1.

**B.** **The Complaint does not adequately allege unreasonable restraint of trade in a defined market in violation of Section 1.**

**1.** *Plaintiff's Section 1 claim should be analyzed under the rule of reason.*

To determine whether an alleged agreement unreasonably restrains competition, courts presumptively apply "rule of reason analysis" except in very limited circumstances. *Texaco*, 547 U.S. at 5–6 & n.1 (observing that, had the plaintiffs challenged the formation of a joint venture "itself," "they would have been required to show that its creation was anticompetitive under the rule of reason"); *see also Copperweld*, 467 U.S. at 768 (holding that joint ventures "are judged under a rule of reason"). A small number of agreements, however, are subject to a "*per se*" rule and are conclusively presumed to unreasonably restrain competition—namely price fixing and output restriction whose nature and effect are so "plainly" or "manifestly" anticompetitive that no elaborate study is necessary to determine their effect on competition. *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723-24 (1988); *see United States v. Topco Assocs.*, 405 U.S. 596, 607–08 (1972) (holding that "it is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act."). And the Supreme Court has repeatedly cautioned lower courts from an overzealous application of the *per se* doctrine. *NYNEX*

*Corp. v. Discon, Inc.*, 525 U.S. 128, 138 (1998); *Nw. Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*, 472 U.S. 284, 297 (1985) (concluding that the district court "followed the correct path of analysis—recognizing that not all concerted refusals to deal should be accorded per se treatment"). The Supreme Court has further cautioned that the *per se* rule should be applied only after a threshold examination of market conditions. *See NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n. 26 (1984) (observing that "[p]er se rules may require considerable inquiry into market conditions before the evidence justifies [the] presumption of anticompetitive conduct"). This is because the *per se* rule "require[s] the Court to make broad generalizations about the social utility of particular commercial practices" and reflects the judgment that any instances of such practices harm competition and "are not sufficiently common or important to justify the time and expense necessary to identify them." *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 n. 16 (1977).

The Seventh Circuit similarly limits application of the *per se* rule. *See U.S. Trotting Ass'n v. Chi. Downs Ass'n, Inc.*, 665 F.2d 781, 788 (7th Cir. 1981) (en banc) ("The danger of rote application of the per se rule to all conduct that can be called a 'group boycott' is that the sound teachings of experience will be extended into new and unfamiliar areas, where they have no proper application."); *see also In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011–12 (7th Cir. 2012) ("The per se rule is designed for cases in which experience has convinced the judiciary that a particular type of business practice has no (or trivial) redeeming benefits ever."). To put it plainly, "not all alleged group boycotts or refusals to deal will be characterized as *per se* violations." *Vuciecevic v. MacNeal Mem'l. Hosp.*, 572 F. Supp. 1424, 1427 (N.D. Ill. 1983).

The gravamen of Plaintiff's Section 1 claim appears to be that Mustang's alleged abstention from Plaintiff's business proposal constitutes a group boycott by Defendants. But there is no

16

dispute that the decision was made by Mustang (a single entity), *see* Compl. ¶ 54, and Plaintiff's reliance on group pleading cannot be used to mask the corporate separateness of Mustang and its owners to manufacture a Section 1 claim. Moreover, a joint venture and its members have no more duty to deal with its rivals than they would if they were each operating independently. *See Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1205 (7th Cir. 1981) (describing the "longstanding antitrust principle that Section 1 of the Sherman Act does not preclude a party from unilaterally determining the parties with whom it will deal and the terms on which it will transact business."). Nonetheless, Plaintiff contends that this "contract to deny" should be considered a *per se* violation of Section 1. Compl. ¶ 61.

Plaintiff alleges *per se* analysis is required here merely because Defendants declined to enter into business with it. But where, as here, "the alleged 'boycott' merely entails the refusal by a group of competitors to deal with another trader on their own level of distribution, considerations of industry structure and anticompetitive potential remain paramount." *Phil Tolkan Datsun Inc.*, 672 F.2d 1280, 1286 (7th Cir. 1982). The Seventh Circuit in *Phil Tolkan Datsun* explained that *per se* analysis was only appropriate for an alleged group boycott where there is an allegation of direct effort to influence the supply of, or demand for, a competitor's product. Plaintiff has not made any such allegation and thus cannot sustain a claim that Defendants' conduct was *per se* illegal.

### 2. *The Section 1 count fails to allege an unreasonable restraint of trade in the relevant market as required under a rule of reason analysis.*

Plaintiff argues in the alternative that Defendants' alleged conduct "violates the rule of reason because this contract constrains the potential suppliers of crude oil, which allows Enbridge and ExxonMobil to dictate the price of oil to buyers." Compl. ¶ 62. But Plaintiff also fails to satisfy the requirements of that test.

17

"The rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure ... to assess the [restraint]'s actual effect' on competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (alteration and omission in original) (citing *Copperweld,* 467 U.S., at 768 (1984)). "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* at 2284; *Riley v. Info. Sys. Audit and Control Ass'n, Inc.*, No. 22-cv-4465, 2023 WL 3997075, at *2 (N.D. Ill. Jun. 14, 2023) ("Sections 1 and 2 of the Sherman Act…require the plaintiff to plead a relevant product market."); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 531 (7th Cir. 1986) ("[S]ection 1 claims analyzed under the Rule of Reason, require the trier of fact to delineate the 'relevant market.'").

However, as in its Section 2 count, *see supra* Section II.A, Plaintiff has failed to clearly define the "relevant market" let alone demonstrate "substantial anticompetitive effects." The closest Plaintiff comes to defining the relevant market is the allegation that Mustang was formed— decades prior to the conduct at issue in the Complaint—to control the "mov[ement of] crude oil from Alberta and North Dakota to refineries in the Midwest and Gulf Coast regions." Compl. ¶ 59. But Mustang only represents one of four pipelines moving crude oil across those regions (and it has no involvement in the other means of moving crude oil, such as rail), and therefore cannot be said to "deny others the ability to move crude oil" across that region. *Id.*

Mustang lacks "[s]ubstantial market power," which is "an essential ingredient of every antitrust case under the Rule of Reason." *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994). As discussed *supra* Section II.A, even if the Complaint adequately alleged a relevant market consisting of four pipelines running south of Chicago, Mustang only constitutes a quarter of that market, and therefore lacks the ability to substantially alter the market's

total output.  *See Ball Mem'l Hosp. v. Mut. Hosp. Ins.*, 784 F.2d 1325, 1334–35 (7th Cir. 1986) (describing market power in terms of "a firm's share of current sales" and the "ability to cut back the market's total output").

For largely these same reasons, Plaintiff has failed to demonstrate that the alleged misconduct had "substantial anticompetitive effects" or harmed consumers in the market.  A defendant must have market power in order for its conduct to generate anticompetitive effects. *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012) ("As a threshold matter, a plaintiff must show that the defendant has market power … without which the defendant could not cause anticompetitive effects on market pricing.").  Plaintiff's primary complaint is that its proposed business venture failed to materialize, Compl. ¶ 63, but a harm claimed by a single failed competitor does not constitute "anticompetitive effects" that harm consumers writ large.  *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984), *abrogated on other grounds by Schmees v. HC1.COM, Inc.,* 77 F.4th 483, 489 (7th Cir. 2023).

## IV.    PLAINTIFF LACKS ANTITRUST STANDING

For an antitrust plaintiff to prevail on its claim, it must establish standing, that is, that the "plaintiff is a proper party to bring a private antitrust action."  *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.1 (1983); *see also Greater Rockford Energy v. Shell Oil*, 998 F.2d 391, 401 n.13 (7th Cir. 1993) ("The crux of the standing analysis is whether the plaintiff is the proper party to vindicate the antitrust interest.").  Antitrust standing requires that the plaintiff demonstrate both an "antitrust injury" and a "direct link between the antitrust violation and the antitrust injury."  *Greater Rockford*, 998 F.2d at 395; *see also Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*, 596 F. Supp. 3d 1076, 1091 (N.D. Ill. 2022).  An antitrust injury is an injury "of the type the antitrust laws were intended to prevent and reflect[s] the

anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation." *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006) (internal citation and quotation marks omitted); *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) ("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."). Courts consider the following factors when analyzing whether a plaintiff's alleged injury is sufficiently linked to the alleged wrongdoing by defendants: "(1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 484 (7th Cir. 2002).

Here, Plaintiff has failed to adequately plead an antitrust injury, let alone a connection between an antitrust injury and an alleged antitrust violation, which should be the end of the matter. *Cf. Greater Rockford*, 998 F.2d at 404 ("Because a showing of both antitrust injury and antitrust standing are necessary to proceed under § 4 [of the Clayton Act], the plaintiffs' inability to show antitrust injury is a sufficient basis for dismissing their case.").

Plaintiff here has not adequately alleged antitrust injury—it claims only that it incurred costs and lost profits resulting from its competitors' refusal to facilitate its entrance into the market. Compl. ¶ 70. But this supposed injury is ***to Plaintiff***, not to competition in the market as a whole. "Only those injured by anticompetitive conduct affecting the marketplace are compensated under these laws." *Nelson*, 925 F.2d at 1577 (Pell, J., concurring in part); *see also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal

antitrust laws."). A loss of business by the Plaintiff is insufficient to support a Sherman Act claim unless accompanied by "an injury to the market." *Car Carriers,* 745 F.2d at 1107; *see also Contractor Util. Sales Co. v. Certain-Teed Prod. Corp.,* 638 F.2d 1061, 1078 n.21 (7th Cir. 1981), *abrogated on other grounds by Rissman v. Rissman*, 213 F.3d 381, 385 (7th Cir. 2000) ("[T]he losers [in the marketplace] must prove more than just their loss in order to secure relief under the antitrust laws."). To that end, Plaintiff must plausibly allege that its injury "flows" from "higher prices and lower output." *Int'l Bhd. of Teamsters, Loc. 734 Health & Welfare Tr. Fund*, 196 F.3d 818, 825 (7th Cir. 1999); *see also Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992) ("The antitrust injury doctrine … requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers." (internal citations omitted)); *Nelson*, 925 F.2d at 1564 ("[A]ntitrust injury means injury from higher prices or lower output, the principal vices proscribed by the antitrust laws." (internal quotation marks omitted)).

Indeed, allowing Plaintiff to seek relief for these supposed violations of the Sherman Act would effectively transform *all* negotiations between competitors into antitrust violations whenever an agreement is not reached. This is certainly not what Congress had in mind when enacting the Sherman Act and would fundamentally expand the scope of antitrust law. *Brown Shoe Co.*, 370 U.S. at 320.

To the extent that Plaintiff argues that Mustang allegedly charging higher prices in 2023 constitutes an antitrust injury, Compl. ¶ 56, Plaintiff lacks antitrust standing because Plaintiff never alleges that *it* ever paid a higher price for crude oil because of the alleged conduct. Indeed, it is telling that no customer of the Mustang Pipeline has ever made any such allegation. *See Associated Gen. Contractors of Cal., Inc.*, 459 U.S. at 542 ("The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust

21

enforcement diminishes the justification for allowing a more remote party ... to perform the office of a private attorney general.").  The Seventh Circuit has "interpreted this to mean that only those 'who can most efficiently vindicate the purposes of the antitrust laws' have standing to bring a private antitrust action." *Fisher v. Aurora Health Care, Inc.*, 558 F. App'x 653, 655 (7th Cir. 2014) (quoting *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 598 (7th Cir. 1995)).  Plaintiff, a would-be competitor whose proposed business venture failed to materialize, is hardly an efficient enforcer of the "purposes of the antitrust laws."

Nor does Plaintiff demonstrate any "causal connection" between the alleged antitrust violation and the higher prices.  There are countless reasons prices may increase in a given year that are unrelated to anticompetitive conduct.  Plaintiff has failed to make the requisite connection between the alleged violation and the alleged injury.

The other standing factors are no more favorable.  Proposed business dealings that do not come to fruition are hardly evidence of an improper motive.  And, as discussed above, the unrealized business proposals of would-be competitors are *not* the kind of injury the antitrust regime is designed to remedy.  *Nelson*, 925 F.2d at 1577.  Thus, even if Plaintiff's allegations did sufficiently allege an antitrust injury, Plaintiff is not a "proper party to vindicate the antitrust interest" at issue.  *Greater Rockford*, 998 F.2d at 401 n.13.

## V.  THE STATE LAW ANTITRUST CLAIMS PARALLEL THE FEDERAL CLAIMS

Plaintiff's attempts to plead state law antitrust violations fare no better than its federal claims.  The Complaint asserts claims under the Illinois Antitrust Act, 740 ILCS 10/3(1), (2) & (3).  *See* Compl. ¶¶ 71–85.  As Plaintiff concedes, *see* Compl. ¶¶ 72, 80, Sections 10/3(1) and (2) parallel Section 1 of the Sherman Act, *see Laughlin v. Evanston Hosp.*, 133 Ill. 2d 374, 384 (1990); *People ex rel. Scott v. Coll. Hills Corp.*, 91 Ill.2d 138 (1982), while 10/3(3) parallels Section 2 of

the federal statute, *see Hackman v. Dickerson Relators, Inc.*, 595 F. Supp. 2d 875, 880 (N.D. Ill. 2009). Given that the federal pleading standards apply in diversity claims, *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2006), Plaintiff's state antitrust claims, like its federal ones, fail to state a claim upon which relief can be granted. *See Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). Additionally, Plaintiff's state law claim under Count III is also time-barred. *See* 740 ILCS 10/7.

## VI. THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE TORTIOUS INTERFERENCE AGAINST ENBRIDGE

### A. Plaintiff's tortious interference claim should be dismissed because it is based on the same alleged conduct as Plaintiff's failed antitrust claims.

Plaintiff's tortious interference claim fails because it is based on the same deficient allegations that underlay its failed antitrust claims. Plaintiff's tort claim, like the antitrust claims, is premised on the allegation that Enbridge rejected Plaintiff's business proposal on behalf of Mustang. *Compare, e.g.*, Compl. ¶ 90 (premising the tortious interference claim on "Enbridge stopp[ing] Mustang from agreeing to Ducere's Terminal"), *with* Compl. ¶ 68 (premising the Section 2 claim on Enbridge and Mustang "refusing to allow [Plaintiff] to build a terminal" to connect to the Mustang Pipeline). But this Court has ruled that if a tortious interference claim is premised on the same factual allegations as a failed Sherman Act claim, then the tortious interference claim must fail as well. *See JamSports & Ent., LLC v. Paradama Prods.*, 382 F. Supp. 2d 1056, 1062 (N.D. Ill. 2005) (ruling that because "[t]he jury found against JamSports on [its] antitrust claim" at trial, the defendant was "entitled to entry of judgment as a matter of law on the" factually analogous "claim of tortious interference"); *House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11-cv-07834, 2014 WL 6845862, at *9 (N.D. Ill. Dec. 4, 2014) (dismissing a tortious interference claim because the plaintiff's "antitrust claims [were] insufficient as a matter of law,

… and the [complaint] allege[d] no other wrongful conduct").[10]  Accordingly, Plaintiff's tortious

interference claim should suffer the same fate as its antitrust claims—it should be dismissed.

### B. Enbridge was privileged to reject Plaintiff's business proposal on behalf of Mustang, a company Enbridge owns and manages.

Plaintiff's tortious interference claim is also barred by an immunity privilege because it

challenges conduct that Enbridge took on behalf of its own joint venture, Mustang.  Under Illinois

law, a company's officers, owners, and duly appointed decision makers cannot be liable for

tortious interference claims based on conduct taken on the company's behalf—including when an

entity, like Enbridge, acts on behalf of an LLC that it owns and manages, like Mustang.  *See 3Com*

*Corp. v. Elec. Recovery Specialists, Inc.*, 104 F. Supp. 2d 932, 938 (N.D. Ill. 2000) ("Illinois law

grants a qualified privilege to corporate officers protecting them from liability for decisions made

on behalf of the company."); *Green Light Nat'l LLC v. Kent*, No. 17-cv-6370, 2018 WL 4384298,

at *7–8 (N.D. Ill. Sept. 14, 2018) (applying the privilege to actions taken by an entity on behalf of

an LLC, like Mustang); *Nation v. Am. Cap., Ltd.*, 682 F.3d 648, 652 (7th Cir. 2012) (recognizing

that the privilege applies to entities, like Enbridge, that own or manage other entities).

Here, Enbridge is simply accused of "stopp[ing] Mustang from agreeing to Ducere's"

business proposal.  Compl. ¶ 90.  But this conduct squarely falls within the scope of the immunity

privilege because Enbridge is an owner and decision maker for Mustang.  Enbridge owns a 30%

interest in Mustang.  Compl. ¶ 20.  Enbridge employees hold two of Mustang's four total Board

seats.  Compl. ¶ 21.  And, most significantly, Mustang cannot take any major action—including

agreeing to Plaintiff's business proposal—without Enbridge's approval.  Compl. ¶¶ 22–23.  These

allegations firmly establish not only Enbridge's ownership stake in Mustang, but also that

---

[10] *See also Kentmaster Mfg. Co. v. Jarvis Prods. Corp.*, 146 F.3d 691, 695 (9th Cir. 1998) (affirming dismissal of tortious interference claim because the plaintiff alleged "no other wrongful act except those [the court had] already held to be insufficient" to state a claim under the Sherman Act).

Enbridge was duly authorized to act on Mustang's behalf with respect to Plaintiff's business proposal. As a result, Enbridge's rejection of this proposal is privileged and cannot give rise to liability for tortious interference under Illinois law. *See, e.g.*, *Green Light Nat'l*, 2018 WL 4384298, at *7–8 (dismissing tortious interference claim because the defendants were privileged to act on behalf of the LLC of which they were members).

Additionally, there are no allegations, much less plausible ones, suggesting that the rejection of Plaintiff's business proposal was against Mustang's self-interest—a showing which is Plaintiff's sole path to overcoming the privilege that otherwise protects Enbridge's ability to act on behalf of its joint venture. *3Com Corp.*, 104 F. Supp. 2d at 938. To the contrary, the Complaint states that Mustang "benefited greatly after refusing to move forward with" the proposed deal, and even suggests that the decision to not do business with Plaintiff led to increased profits for Mustang in 2023. Compl. ¶¶ 55–56. In short, an immunity privilege applies to Enbridge's challenged conduct, and Plaintiff's tortious interference claim should be dismissed with prejudice.

### C. The competitor's privilege also shields Enbridge from tortious interference liability because the challenged conduct simply reflects Enbridge competing.

The tortious interference claim similarly fails under a separate privilege—the competitor's privilege. Courts have recognized time and time again in antitrust and tortious interference cases that competition, "though painful, fierce, frequently ruthless, [and] sometimes Darwinian in its pitilessness, is the cornerstone of our highly successful economic system." *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999). Accordingly, the aptly named "competitor's privilege" safeguards an entity's ability "to engage in business and to compete," and "allows one to divert business from one's competitors generally as well as from one's particular competitors provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will." *Soderlund Bros. v. Carrier Corp.*, 663 N.E.2d 1, 8 (Ill. App. Ct. 1995).

These hallmarks of competition apply with equal force here. Plaintiff casts Enbridge as a potential competitive rival, and merely accuses Enbridge of voting against a deal that, if consummated, threatened to divert business away from Enbridge and Mustang and towards Plaintiff, a potential competitor. Compl. ¶¶ 68–69 (alleging that the decision to reject Plaintiff's proposal prevented "competitors," namely Plaintiff, from threatening Enbridge and Mustang's business in "the crude oil transportation market in Chicago"); Compl. ¶ 55 (recognizing that "Enbridge and Mustang have benefited greatly after refusing to" do business with Plaintiff). And while Plaintiff offers an unfounded allegation that Enbridge blocked the proposal "without any justification," Compl. ¶¶ 90–92, the Complaint itself states that both Enbridge and Mustang "benefited greatly after refusing to move forward with the Terminal," and that Enbridge in particular "enjoyed overwhelming demand from customers to sign long-term contracts to ship crude oil on its pipelines south of the Chicago area." Compl. ¶ 55. Even if the Complaint's allegations are assumed as true for purposes of this motion, they simply reflect that Enbridge desired to compete—not to tortiously interfere. And, of course, "[c]ompetition is not a tort." *Speakers of Sport*, 178 F.3d at 865. As such, the competitor's privilege completely bars the tortious interference claim against Enbridge and Count V should be dismissed with prejudice.

### D. Plaintiff has not adequately pled the elements of a tortious interference claim.

Plaintiff's tortious interference claim against Enbridge independently fails because Plaintiff has not plausibly alleged an essential element of the cause of action: that "intentional and unjustified interference by" Enbridge "caused a breach or termination of" Plaintiff's business expectancy with Mustang. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007) (internal citation omitted). Illinois law sets a high bar for conduct that can give rise to tortious interference claims, as this cause of action is not intended to interfere with or undermine

robust competition. *See Fid. Nat'l Title Ins. Co. v. Westhaven Props. P'ship*, 898 N.E.2d 1051, 1067–68 (Ill. App. Ct. 2007). To be actionable, the alleged "conduct must be wrongful, such as fraudulent, deceitful, intimidating, or deliberately disparaging." *Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 2d 954, 971 (N.D. Ill. 2007).

Plaintiff comes nowhere close to clearing this hurdle. At most, it baselessly alleges, in conclusory fashion, that Enbridge "pressured and intimidated Mustang into not doing business with Ducere." Compl. ¶ 90. However, there are no factual allegations purporting to explain ***how*** Enbridge "intimidated" Mustang. This single, barebones allegation merely pays lip service to the legal requirements of a tortious interference claim, and is woefully insufficient under federal pleading standards. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *St. Charles Riverfront Station Inc. v. Empress Casino Joliet Corp.*, 5 F. Supp. 2d 592, 594 (N.D. Ill. 1998) (dismissing a tortious interference claim because "the complaint consist[ed] of a single, conclusory allegation without any factual support" regarding the essential element of the defendant "us[ing] 'improper means'" to interfere with a contractual relationship).

In any event, the Complaint itself disproves the notion that Enbridge "pressured" or "intimidated" Mustang into not doing business with Plaintiff. Compl. ¶ 90. Crucially, Plaintiff's burden is to plausibly allege that the asserted "intentional and unjustified interference"—*i.e.*, Enbridge's supposed intimidation tactics—"***induced or caused*** [the] breach or termination of the [business] expectancy." *Borsellino*, 477 F.3d at 508 (internal citation omitted, emphasis added); *see also Koehler v. Packer Grp., Inc.*, 53 N.E.3d 218, 240–41 (Ill. App. Ct. 2016) (affirming jury instructions stating that the plaintiff needed to prove "that each element of damages claimed '***occurred as a direct and natural result***' of the individual defendants' tortious interference")

(emphasis added). Plaintiff's own allegations foreclose it from satisfying this causation requirement. Plaintiff concedes that approval from **both** Enbridge **and** ExxonMobil was necessary in order for Mustang to accept Plaintiff's business proposal. Compl. 21–23. In other words, Enbridge's votes declining to participate in Plaintiff's proposal ending Mustang's interest in the proposal. Any alleged "pressure" or "intimidation" tactics employed by Enbridge—even if directed at Mustang's other Board members to convince them to also vote against the deal—would have been wholly irrelevant to the final outcome. Moreover, Plaintiff does not even allege that ExxonMobil (whose approval was also necessary in order for the deal to move forward) ever supported Plaintiff's business proposal, or that it was ever inclined to vote in favor of approving it in its capacity as a Mustang Board member. These concessions are fatal to the tortious interference claim, and Count V must be dismissed for this reason as well.

## **CONCLUSION**

For the reasons discussed above, the Complaint should be dismissed with prejudice.

DATED: April 11, 2024        Respectfully submitted,

        */s/ Ryan P. Phair*
        Ryan P. Phair
        Michael F. Murray (*pro hac vice*)
        Vanessa Omoroghomwan (*pro hac vice*)
        Molly Teague (*pro hac vice*)
        PAUL HASTINGS LLP
        2050 M Street NW
        Washington, DC 20036
        Tel: 202.551.1705
        ryanphair@paulhastings.com

        *Counsel for Defendant*
        MUSTANG PIPE LINE LLC

DATED:  April 11, 2024                              Respectfully submitted,

                                                    */s/ Carolyn Pelling Gurland*
                                                    Carolyn Pelling Gurland (Bar No. 6274399)
                                                    WHITE & CASE LLP
                                                    111 South Wacker Drive, Suite 5100
                                                    Chicago, IL 60606
                                                    Tel: 312.881.5405
                                                    carolyn.gurland@whitecase.com

                                                    Kathryn Jordan Mims (*pro hac vice
                                                    forthcoming*)
                                                    WHITE & CASE LLP
                                                    701 13th Street, NW, Suite 600
                                                    Washington, DC 20005
                                                    Tel. 202.626.3704
                                                    kmims@whitecase.com

                                                    David H. Suggs (*pro hac vice forthcoming*)
                                                    Holly Tao (*pro hac vice forthcoming*)
                                                    WHITE & CASE LLP
                                                    1221 Avenue of the Americas
                                                    New York, NY 10020
                                                    Tel. 212.819.2686
                                                    dsuggs@whitecase.com
                                                    holly.tao@whitecase.com

                                                    *Counsel for Defendant*,
                                                    EXXONMOBIL OIL CORPORATION

DATED:  April 11, 2024          Respectfully submitted,

*/s/ James F. Herbison*
  James F. Herbison, #6275116
  Michael P. Mayer, #627677
  WINSTON & STRAWN LLP
  35 W. Wacker Drive
  Chicago, IL 60601-9703
  Tel: (312) 558-5600
  jherbiso@winston.com
  mmayer@winston.com

  *Counsel for Defendant*
  Enbridge (U.S.) Inc.

## <u>CERTIFICIATE OF SERVICE</u>

I hereby certify that on April 11, a copy of the foregoing was filed electronically and served via CM/ECF upon the following parties:

Rex A. Sharp
Nathan A Kakazu
SHARP LAW, LLP
4820 W. 75th Street
Prairie Village, KS 66208
Tel.: 913.901.0505
Fax: 913.901.0419
Email: rsharp@midwest-law.com
         nkakazu@midwest-law.com

*Counsel for Plaintiff Ducere, LLC*

/s/ *Ryan P. Phair*
Ryan P. Phair