**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Ducere LLC,                                  )
                                             )
                Plaintiff,                   )
                                             )        No. 1:24-cv-01217
        v.                                   )
                                             )        Judge April M. Perry
Enbridge (U.S.) Inc.,                        )
                                             )
                Defendant.                   )

**<u>OPINION AND ORDER</u>**

Every day, oil refineries in the United States process millions of barrels of crude oil into fuel and other petroleum products. But before processing anything, refineries need to transport crude oil from reserves sometimes hundreds or even thousands of miles away: no small feat.

This case involves the businesses that provide—or aspire to provide—crude oil transportation services. Plaintiff in this case is Ducere LLC. Ducere envisioned constructing a facility south of Chicago that would draw Canadian crude oil from another company's pipeline onto barges for shipment south along the United States' navigable waterways. Doc. 46 ¶¶ 33-34. Ducere believed this facility would allow it to provide an alternative to pipeline-based crude oil transportation for refineries in the southern Midwest and Gulf Coast. *Id.* at ¶¶ 27, 36. But for its plan to work Ducere needed the owner of an existing pipeline to let it construct an adjoining terminal. Ducere thought it found that owner in Mustang Pipe Line LLC ("Mustang"), which operates a pipeline running south out of the Chicago area. *Id.* at ¶¶ 19, 37. Mustang was initially receptive to the proposal, and so for a few years Ducere spent time and resources preparing for construction of its terminal. *Id.* at ¶¶ 38-44. Then, before the negotiated contracts were signed, Mustang pulled out. *Id.* at ¶¶ 47-51. Ducere blames Mustang's change of heart on Enbridge

(U.S.) Inc. ("Enbridge"), now the sole defendant in this action. According to Ducere, Enbridge representatives on Mustang's board directed the pullout, which preserved Enbridge's dominance in the market for crude oil transportation in the Chicago area. *Id.* at ¶¶ 51-53. Ducere now brings this antitrust case accusing Enbridge of unlawful monopolization under federal and state antitrust laws and demanding damages, costs, and an injunction requiring Mustang to allow construction of Ducere's facility.

Enbridge moves to dismiss Ducere's first amended complaint. Doc. 49. Because the Court finds that Ducere failed to plausibly allege the elements of its monopolization claims, Enbridge's motion to dismiss is granted.

## BACKGROUND

Most crude oil delivered to U.S. refineries arrives by pipelines, some of which pass through the Chicago area. Doc. 46 ¶¶ 13-14.[1] Enbridge owns three pipelines entering the Chicago area, representing 80 percent of the region's pipeline capacity for carrying Canadian oil, and full or majority ownership in three of the four pipelines exiting the area south. *Id.* at ¶¶ 15, 17. The fourth pipeline heading south is owned by Mustang, a joint venture between a wholly owned Enbridge subsidiary and Mobil Illinois Pipe Line Company, a subsidiary of ExxonMobil Oil Corporation ("ExxonMobil"). *Id.* at ¶¶ 3, 18. According to Ducere, Enbridge effectively controls access to the Mustang pipeline because two Enbridge representatives sit on Mustang's four-person board and all board members must agree on any major action, giving Enbridge veto power over major business decisions. *Id.* at ¶¶ 18, 49. Overall, Enbridge's pipelines allow it to

---

[1] These facts are drawn from the allegations in Ducere's first amended complaint and for the purposes of this motion to dismiss the Court presumes them to be true, drawing all reasonable inferences in Ducere's favor.

transport Canadian crude oil to refineries south of the Chicago area, including in the southern Midwest and Gulf Coast. *Id*. at ¶¶ 16, 19, 27.

Enter Ducere. Ducere also wanted to transport Canadian crude oil to these refineries. In early 2020 it approached Mustang with a proposal to build a terminal that would pull crude oil from Mustang's pipeline onto barges. *Id.* at ¶¶ 33-34, 37. These barges would then travel downriver, offering an alternative to pipeline-based transportation of crude oil. *Id*. at ¶ 36. Mustang was initially receptive to Ducere's proposal. Ducere went about the various preliminary steps to construction, including applying for permits, securing financing commitments, and conducting various studies. *Id.* at ¶¶ 39-43. In total, Ducere committed over $11 million towards the work. *Id*. at ¶ 44. By October 2022, Ducere and Mustang had fully negotiated agreements ready to be signed. *Id*. at ¶ 47.

But a few months after a December 2022 meeting of its governing board, Mustang refused to move forward with the deal. *Id.* at ¶¶ 50-51. Ducere blames Enbridge, on the belief that Enbridge representatives exercised their voting power on Mustang's board to scuttle Ducere's business proposal. *Id.* at ¶ 51. As a result, Ducere never completed its facility. Shortly after, Enbridge raised the shipping prices on its pipelines carrying Canadian oil out of Chicago to the southern Midwest and Gulf Coast. *Id*. at ¶¶ 52-53.

On February 13, 2024, Ducere filed its original antitrust complaint, bringing monopolization, conspiracy to monopolize, and tortious interference claims against defendants Mustang, Enbridge, and ExxonMobil. Doc. 1. Defendants filed various motions to dismiss, to which Ducere responded by filing an amended complaint on May 2, 2024. Doc. 38, 40, 42, 46. In its amended complaint, Ducere dropped Mustang and ExxonMobil as defendants and trimmed its claims to four monopolization claims against Enbridge. Doc. 46.

3

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

For allegedly orchestrating Mustang's pulled consent, Ducere accuses Enbridge of two species of antitrust violation: (1) an unlawful refusal to deal; and (2) a violation of the essential facilities doctrine. Doc. 46. at 11-14. Ducere brings these claims under both Section 2 of the Sherman Act and the Illinois Antitrust Act. Because the Illinois Antitrust Act expressly requires harmonization with the federal laws, the Court will analyze Ducere's state law claims in accordance with federal law. *See McGarry & McGarry, LLC v. Bankruptcy Mgmt. Sols.*, 937 F.3d 1056, 1062 (7th Cir. 2019).

"The purpose of the Sherman Act is to protect consumers from injury that results from diminished competition." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334-35 (7th Cir. 2012). Section 2 of the Sherman Act imposes liability on "[e]very person who shall monopolize ... any part of the trade or commerce among the several States." 15 U.S.C. § 2. To

4

state a § 2 monopolization claim, an antitrust plaintiff must plausibly allege that the defendant (1) possesses "monopoly power in the relevant market" and (2) engages in "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 451 (7th Cir. 2020). Ducere must also allege that it is the proper party to bring this suit, i.e., that it has antitrust standing, by alleging that its injuries are "of the type the antitrust laws were intended to prevent" and "attributable to an anti-competitive aspect of the practice under scrutiny." *McGarry & McGarry*, 937 F.3d at 1065.

### A. Monopoly power in a relevant market

To plead a § 2 claim, an antitrust plaintiff must allege that the defendant possesses monopoly power in a relevant market. Market definition and monopoly power go hand in hand, as monopoly power may turn on whether the market is narrowly or broadly defined. *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 667 (7th Cir.1987) ("*Valley Liquors II*"). The Court will start by analyzing Ducere's proposed market, before turning to its monopoly power allegations.

### a. Relevant market

Antitrust markets are defined by "how far buyers will go to substitute one commodity for another." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956); *see also Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1410 (7th Cir. 1995) ("In defining a market, one must consider substitution both by buyers and by sellers …"); *In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*, 767 F.Supp.2d 880, 901 (N.D. Ill. 2011) ("[T]he products in a market must have unique attributes that allow them to be substituted for one another, but make them difficult to replace with substitute products from outside the

market."). A relevant market has "both a product and a geographic dimension." *Republic Tobacco Co. v. North Atlantic Trading Co., Inc.*, 381 F.3d 717, 738 (7th Cir. 2004). An antitrust plaintiff must account for both these dimensions because a "properly defined market excludes other potential suppliers (1) whose product is too different (product dimension) or too far away (geographic dimension) and (2) who are not likely to shift promptly to offer defendant's customers a suitably proximate (in both product and geographic terms) alternative." *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917 (7th Cir. 2020), citing Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 530a (4th ed. 2019).

Courts apply a pragmatic and factual approach when defining a geographic market to ensure correspondence "to the commercial realities of the industry." *Sharif Pharmacy*, 950 F.3d at 917. Applying this approach, the Court starts with the premise that crude oil transportation is a service only bought in connection with the purchase of crude oil. Ducere's complaint alleges no other reason a buyer would purchase crude oil transportation, nor any reason a buyer would care about the route oil travels from reserve to refinery, so long as it arrives as reliably and cheaply as possible.

With these concepts in mind, the Court finds the market alleged by Ducere (Canadian crude oil transportation services in the Chicago area) is not a plausible relevant market. Doc. 46 at ¶¶ 54-56. Starting with geographic market, Ducere must allege that purchasers cannot substitute oil transported through the Chicago area with oil transported via other routes. *See Fed. Trade Comm'n v. Advocate Health Care Network*, 841 F.3d 460, 468 (7th Cir. 2016) (properly defined geographic market "must include the sellers or producers who have the ability to deprive each other of significant levels of business"). Ducere has not done so. Here, none of the

6

purchasers are actually in the Chicago area. Rather, they are refineries in the southern Midwest and Gulf Coast. The pipeline map in Ducere's complaint shows numerous routes for Canadian oil to travel across the United States, including routes that avoid the Chicago area altogether. *See Id*. at ¶ 14. This begs the question: if Enbridge raises its transportation prices through Chicago, what stops a refinery in the Gulf Coast or southern Midwest from switching to another pipeline route that avoids the Chicago area? Ducere's complaint does not say, and so its narrowly localized geographic market is not plausible.

Ducere's proposed product market fares no better. It presents Canadian crude oil transportation as a distinct market but makes no effort to explain why Canadian crude oil cannot be substituted for oil from other regions. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (product market must consider all reasonably interchangeable substitutes). Indeed, Ducere's complaint identifies vast reserves in North Dakota. *See* Doc. 46 at ¶ 14. What prevents refineries from substituting crude oil from Canada (and related transportation services) with oil from North Dakota, to say nothing of oil outside these two regions? Such substitutions would allow purchasers of Enbridge's transportation services to evade its alleged dominance over the Canadian oil-carrying pipelines in the Chicago area. Without alleging anything to support the inference that Enbridge's customers cannot make these substitutions, the Court cannot reasonably infer that Canadian crude oil transportation exists as a distinct product market.

To be clear: there may be reasons why at least some buyers lack reasonable substitutes for Canadian crude oil transported through the Chicago area. Ducere suggests as much: for instance, in its response to Enbridge's motion to dismiss, Ducere notes that without access to Canadian oil, certain Midwest refineries could not obtain enough crude oil to operate. Doc. 57 at 5. These sorts of details, currently absent from Ducere's first amended complaint, would help

clarify the commercial realities of crude oil transportation with respect to substitution. At this time, however, the Court lacks sufficient basis to accept Ducere's proposed market as plausible.

To the extent the complaint does not explicitly allege a plausible market, the question becomes whether any reasonable inference could be made from the facts in the complaint to support one. Ducere's complaint focuses on the effects of Enbridge's alleged pipeline control on refineries south of Chicago, primarily in the southern Midwest and Gulf Coast. Doc. 46 at ¶¶ 16, 19, 34, 52, 61, 68. It also describes the region "south of the Chicago area" as the "exact area that would have been served by Ducere if it had been allowed to build its terminal." *Id.* at ¶ 52. As such, the Court will scope the market by considering the potential crude oil transportation options to these refineries. That is, drawing all reasonable inferences in Ducere's favor, the Court will analyze whether Ducere has sufficiently pled Enbridge's possession of monopoly power in the market for crude oil transportation services in which southern Midwest and Gulf Coast refineries are buyers.

### b. Monopoly power

"A company has market power if it can raise prices above a competitive level without losing its business." *42nd Parallel North v. E Street Denim Co.*, 286 F.3d 401, 405 (7th Cir. 2002). Two methods are accepted for proving possession of monopoly power: (1) "through direct evidence of anticompetitive effects;" or (2) "by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in that case." *Toys "R" Us, Inc. v. Fed. Trade Comm'n*, 221 F.3d 928, 937 (7th Cir. 2000). Under the first method, the plaintiff must allege "proof of actual detrimental effects on competition … such as reduced output, increased prices, or decreased quality in the relevant market." *Ohio v. American Express Co.*, 585 U.S 529, 542 (2018) (cleaned up). Under the

second method, plaintiff must allege facts that allow an inference of monopoly power "from possession of a substantial percentage of the sales in a market carefully defined in terms of both product and geography." *Valley Liquors v. Renfield Importers, Ltd.*, 678 F.2d 742, 745 (7th Cir. 1982) ("*Valley Liquors I*"); *see also Toys "R" Us*, 221 F.3d at 937. As a general rule in monopolization cases, allegations that defendant's market share is at least 50 percent will support an inference of monopoly power. *Valley Liquors II*, 822 F.2d at 666. If defendant's market share is lower, a showing of special market conditions or other evidence may be required to plead market power. *Id.* at 667.

Ducere fails to allege Enbridge's possession of monopoly power under either method. Starting with its direct evidence, Ducere alleges that after its proposal was denied, Enbridge "increase[d] the price of oil being transported along the Mustang system" and "enjoyed overwhelming demand from customers to sign long-term contracts with higher prices to ship crude oil on its pipelines south of the Chicago Area." Doc. 46 at ¶¶ 52-53. Even drawing all reasonable inferences in Ducere's favor, these allegations are too thin to support an inference of Enbridge's monopoly power. Price increases occur for various reason, and Ducere alleges nothing about these hikes to suggest they are out of the ordinary. To be sure, these hikes occurred after Enbridge vetoed Ducere's proposal, but that timing doesn't tell the Court anything meaningful about the competitive landscape. It would be one thing if by refusing to deal with Ducere Enbridge eliminated an existing transportation option for refineries in the southern Midwest and Gulf Coast. But Ducere never had a viable facility and Ducere does not allege how long it would have taken to build one or how many customers relied upon it being built. Enbridge therefore could have easily raised its prices at any point, which makes it less plausible

that the price hikes were an exercise of monopoly power. Thus, without something more, Ducere's allegations are inadequate direct evidence of Enbridge's monopoly power.

Ducere's indirect evidence fares no better. Ducere focuses on Enbridge's near total control over the various pipelines that enter the Chicago area from Canada and then travel south. Doc. 46 at ¶¶ 14, 16-18, 27. But percent control over pipelines does not necessarily translate to a proportionate percent of market share. Rather, to understand whether Enbridge's alleged control over pipelines in the Chicago area gives it monopoly power, Ducere's allegations must give the Court sound basis to reasonably infer that southern Midwest and Gulf Coast refineries cannot reasonably substitute (1) Canadian crude oil with non-Canadian oil; (2) oil routed through Enbridge's pipelines in the Chicago area with oil routed through non-Enbridge pipelines in other areas; or (3) pipeline-based transportation with transportation by other means, such as rail, truck, or marine vessel.

Because Ducere fails to account for these substitutes, the Court cannot infer Enbridge's share of the relevant market solely from its control of Chicago-area pipelines. Most problematic for Ducere are the several non-Enbridge pipeline routes from Canadian reserves to refineries in the southern Midwest and Gulf Coast. *See* Doc. 46 at ¶ 14. Even drawing the inference in Ducere's favor that this map depicts all the pipeline infrastructure serving refineries in North America, the Court cannot ignore—and Ducere does not address—the possibility that these non-Enbridge pipelines provide refineries with alternatives to transporting oil through the Chicago area, and therefore a way to avoid transacting with Enbridge. Ducere does a slightly better job alleging why non-pipeline transportation, such as rail, truck, or marine vessel, are less viable options. Doc. 46 at ¶¶ 23-26, 57. Most helpfully, Ducere alleges that roughly 75 percent of crude oil reaches refinery by pipeline, which supports the inference that greater pipeline control

translates to greater market power. *Id*. at ¶ 13. To be clear, Ducere's vignettes on their own—about a single train disaster and one failed venture into rail-based transportation—are too decontextualized to persuade the Court that refineries cannot swap pipeline-based transportation for rail. *Id*. at ¶¶ 25-26. That said, pairing these vignettes with the allegation that only one percent of oil is currently transported by rail, *see id*. at ¶ 24, does allow the Court a reasonable, if tentative, inference that rail is not a reasonable substitute for pipeline-based transportation. Still, other issues remain. Ducere alleges, for instance, that transport by marine vessel is not available to Midwest refineries. Doc. 46 at ¶¶ 23-24. But Gulf Coast refineries presumably do not have this problem.

Because Ducere does not allege enough for the Court to reasonably infer Enbridge's share of the market for crude oil transportation services to refineries in the southern Midwest and especially the Gulf Coast, it has not adequately pled Enbridge's monopoly power in a relevant market through indirect evidence. This failure is sufficient grounds for the Court to grant Enbridge's motion to dismiss both of Enbridge's § 2 claims, leaving only the question of whether the Court should do so with or without prejudice. To properly answer this question, the Court proceeds to analyze whether Ducere has pled the other elements of its antitrust claims.

### B. Willful acquisition

Beyond establishing a defendant's monopoly power in a relevant market, stating a § 2 monopolization claim also requires plaintiffs to allege that a defendant engaged in the "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482-83 (1992) ("The second element of a § 2

claim is the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor.") (cleaned up). Here, Ducere asserts that Enbridge engaged in such a willful acquisition under refusal to deal and essential facility theories. However, the Court concludes that Ducere has failed to plead the necessary elements of either theory.

### a. Refusal to deal

Not all refusals to deal violate the antitrust laws. "[T]he general rule is that even monopolists are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Viamedia*, 951 F.3d at 454 (internal citation omitted). Thus, courts "have been very cautious in recognizing … exceptions" to the general principle that "the Sherman Act does not restrict the long-recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to the parties with whom he will deal." *Trinko*, 540 U.S. at 408 (cleaned up).

The "leading case for § 2 liability based on refusal to cooperate with a rival" is *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), which the Supreme Court has described as "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. Briefly summarized, *Aspen Skiing* involved two companies operating ski resorts in and around Aspen, Colorado. Defendant owned three of four mountain areas in Aspen, and the plaintiff owned the fourth. For years, plaintiff and defendant jointly issued an all-area ski ticket allowing purchasers to visit all four mountains. Over time, defendant began to demand a greater and greater share of the joint ticket proceeds before ultimately canceling the joint ticket altogether, and refusing all entreaties by plaintiff to revive it, up to and including a refusal to sell tickets to plaintiff for its three areas at even retail prices. *Aspen Skiing*, 472 U.S. at 589-94. Plaintiff sued defendant for

unlawful monopolization on a refusal to deal theory and prevailed both at jury trial and in the eventual appeal to the Supreme Court.

In *Viamedia*, the Seventh Circuit distilled "three key factors" from *Aspen Skiing* to help distinguish lawful from unlawful refusals to deal. *Viamedia*, 951 F.3d. at 456. Taken together, these factors support the inference that a defendant's actions were "prompted not by competitive zeal but by anticompetitive malice," which is the heart of an unlawful refusal to deal. *Trinko*, 540 U.S. at 409. The first factor is whether defendant made a "change in a pattern of distribution that had originated in a competitive market and had persisted for several years [and] including after the character of the market was changed by [defendant's] acquisition of monopoly power." *Viamedia*, 951 F.3d. at 456. This factor "supports a presumption that the joint arrangement was efficient and profitable." *Id*. The second factor is whether the defendant refused to enter a certain species of deal with rivals in markets it monopolizes even though it willingly entered such deals in markets where it is not a monopolist. *Id*. at 457. This factor supports the inference that the type of deal creates profitable products that "satisfy consumer demand," and makes it more plausible that anticompetitive intent—rather than common business sense—motivated a defendant's refusal to engage in monopolized markets. *Aspen Skiing*, 472 U.S. at 603. The third factor is whether the defendant "decided to forgo profitable transactions" when it refused or terminated dealings with a rival. *Viamedia*, 951 F.3d at 457. Such willingness to forego immediate profits suggests that desire to harm competition drove a defendant's refusal to deal; in other words, that the defendant was willing to sacrifice short-term gains in hopes of reaping long-term profits once competition had been eliminated.

Turning to the three *Aspen Skiing* factors identified in *Viamedia*, Ducere argues it is not required to plead the first factor under *Viamedia* and makes no effort to do so. Doc. 57 at 8-9.

13

This is because Ducere and Enbridge did not have a prior, voluntary, and profitable course of dealing. By its own admission, Ducere's proposal was "a new way to transport crude oil from Canada to refineries." Doc. 1 ¶ 36. The Court views this as all but fatal to Ducere's refusal to deal claim. *Trinko* warned that *Aspen Skiing* "is at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S at 409. And in *Aspen Skiing*, the Supreme Court specifically highlighted that defendant's conduct went beyond "merely reject[ing] a novel offer to participate in a cooperative venture that had been proposed by a competitor." *Aspen Skiing*, 472 U.S. at 603. A novel offer is exactly what Ducere made and Enbridge allegedly wanted no part of. As such, even under an extremely permissive reading of *Viamedia*, the fact that Ducere does not and cannot plead the first *Aspen Skiing* factor puts its refusal to deal claim on the thinnest of ice.

Ducere's case does not improve when it comes to the second *Aspen Skiing* factor. Ducere argues that the pipeline map shows Enbridge "regularly allows others to connect to its pipelines in other areas," and, consequently, that the rejection of Ducere's proposal can only be explained by Enbridge's desire to monopolize. Doc. 57 at 8. The Court disagrees with Ducere's analysis. In both *Aspen Skiing* and *Viamedia*, plaintiffs alleged geographic markets where defendants agreed to work with rivals to jointly produce in-demand commodities versus monopolized markets where defendants refused similar offers to make comparable products. *See Aspen Skiing*, 472 U.S. at 603, n. 30 (comparing defendant's participation in joint ski tickets with rivals in competitive markets to refusal to do so in a dominated market); *Viamedia*, 951 F.3d at 444-45 (comparing defendant's willingness to deal with rivals in a competitive geographic market to its refusal to do so in dominated ones). These direct comparisons support the inference that anticompetitive intent drives a defendant's refusal to deal in a monopolized geographic market. Here, Ducere identifies no geographic market where Enbridge allowed a rival to construct a

terminal for barge-based transportation of crude oil. And at oral argument, Ducere's counsel acknowledged that he was not aware of one. Rather, Ducere argues that a pipeline-to-pipeline connection is the equivalent of a pipeline-to-terminal connection. The Court does not believe that this inference can be supported by the facts alleged. A pipeline-to-pipeline connection is materially different from a pipeline-to-terminal connection where the crude oil will be exiting the pipe, pumped into tanks, and transported by barge. The fact that Enbridge has never entered into a deal of this type before makes it unreasonable to infer anticompetitive intent from Enbridge's refusal to do so now. For that reason, Ducere does not and cannot plausibly allege the second *Aspen Skiing* factor.

Finally, Ducere fails to plausibly allege the third *Aspen Skiing* factor. Ducere argues it has because its proposed facility "would be a profitable transaction" for Enbridge, and so Enbridge's efforts to torpedo Ducere's proposal can only be explained by unlawful desire to monopolize. Doc. 57 at 8. This analysis misses the mark. The cases that address the third *Aspen Skiing* factor do not inquire whether a proposed transaction might have been profitable: after all, every proposed deal should be profitable to both sides. Rather, the third factor turns on whether the monopolist was willing to accept an immediate financial loss when ending a relationship with their competitor. *See, e.g., Aspen Skiing*, 472 U.S. at 610 (defendant refused to sell plaintiff at retail prices a product offered to general public); *Viamedia*, 951 F.3d at 446 (defendant's financial forecast predicted a $10.6 million loss within first six months of cutting off relationship with plaintiff). Here, Ducere has alleged that immediate profits followed Enbridge's refusal to deal with Ducere, Doc. 1 ¶¶ 52-53, while at the same time only speculating about the potential for profits had the deal been consummated. No allegation is made that a refinery had actually purchased oil transport services from Ducere or that the negotiated contracts with Mustang

15

contained a minimum amount of guaranteed revenue. Doc. 46 at ¶ 36. Without this information, the Court cannot reasonably infer that Ducere's proposal would have made Enbridge money at all, and the Court certainly cannot infer that vetoing the proposal caused Enbridge a shot-term financial loss. For these reasons, Ducere does not plausibly allege the third *Aspen Skiing* factor.

Ducere urges the Court to not focus too much on the *Aspen Skiing* factors and rather to ask whether the refusal to deal has some anticompetitive flavor. Doc. 57 at 7. The Court agrees with Ducere that *Viamedia* contemplates viable refusal to deal claims that do not perfectly align with the framework set forth in *Aspen Skiing*. *Viamedia*, 951 F.3d at 462 (recognizing "the *Aspen Skiing* factors are helpful but not dispositive" to analyzing refusal to deal claims). But the Court disagrees that *Viamedia* broadens the refusal to deal doctrine enough to save Ducere's claims from dismissal. Rather, the Seventh Circuit has held that a plaintiff must "allege plausibly that the refusal to deal has some of the key anticompetitive characteristics identified in *Aspen Skiing*." *Viamedia*, 951 F.3d at 462. This aligns with the Supreme Court's approach in *Trinko*, where the refusal to deal claim was dismissed because the plaintiff failed to plead the defendant had departed from a prior and voluntary course of dealing. *See Trinko*, 540 U.S. at 409. Because Ducere has failed to plausibly allege any of the *Aspen Skiing* factors, the Court dismisses Ducere's refusal to deal claims.

### b. Essential facilities doctrine

The Court next addresses Ducere's essential facilities claims. While some have questioned the continued validity of the essential facilities doctrine, lower courts are "not authorized to abrogate doctrines that have been endorsed and not yet rejected by the Supreme Court." *Marshfield Clinic*, 65 F.3d at 1413. At its latest opportunity, the Supreme Court declined

to repudiate the doctrine, *see Trinko*, 540 U.S. at 411, and so the Court will proceed to evaluate whether Ducere has stated a viable essential facilities claim.

The essential facilities doctrine instructs that a defendant can violate the antitrust laws when it refuses to provide rivals access to a facility it controls because "a monopolist's control of an essential facility … can extend monopoly power from one stage of production to another, and from one market into another." *MCI Commc'ns Corp. v. American Tel. and Tel. Co.*, 708 F.2d 1081, 1132 (7th Cir. 1983). Put differently, an antitrust problem arises when a firm that competes with rivals in a market also controls access to sources or inputs those rivals need to effectively compete. This creates a situation where a firm with monopolistic control over an upstream input could exercise its control to choke rivals out of a downstream market, spinning two monopolies out of one.

To state a claim under the essential facilities doctrine, Ducere must show that Enbridge "controls a facility essential to its competitors … [and] refuses to allow them access to the facility." *Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1482 (7th Cir. 1991). If rivals can freely compete even without access to defendant's facility—because substitutes are available or because the facility can be reasonably duplicated—the facility is not essential. *See Midwest Gas Servs., Inc. v. Ind. Gas Co.*, 317 F.3d 703, 714 (7th Cir. 2003) (specific pipeline segment controlled by rival was not essential facility to plaintiff with option to access other segments); *see also Burris*, 935 F.2d at 1482 (no essential facility claim where "it would have been economically feasible for competitors to duplicate" defendant's facilities). By the same token, essentiality is lacking if the defendant does not dominate the supply of essential inputs (ergo, is not a monopolist), since this indicates rivals need not negotiate access to defendant's specific facility to acquire the essential inputs to compete. *Marshfield Clinic*, 65 F.3d

at 1413 (essentiality lacking where plaintiff failed to establish defendant's monopolized "any properly defined market").

Here, Ducere alleges that Enbridge controls Mustang's pipeline and Mustang's pipeline is essential to competition because without access to it, Ducere cannot build its terminal and sell crude oil transportation services to refineries in the southern Midwest and Gulf Coast. Doc. 46 at ¶ 75. That is not enough to state an essential facilities claim. As the Court has already explained, Ducere fails to plausibly allege that the only source of crude oil for southern Midwest and Gulf Coast refineries is Canadian oil transported through Chicago, generally, let alone the Mustang pipeline, specifically. To the contrary, the map provided by Ducere in its complaint shows numerous pipelines that travel to the Midwest and Gulf Coast that are not the Mustang pipeline. *Id.* at ¶ 14. Enbridge also alleges nothing to plausibly suggest that any of Enbridge's current rivals—who have their own pipelines or who can transport oil by some non-pipeline method— need access to the Mustang pipeline in order to compete with Enbridge in the market for delivering crude oil transportation. That alone is enough to dispose of Ducere's essential facility claim as fatally underdeveloped.

Really, the only rival who Ducere alleges needs access to the Mustang pipeline is Ducere itself. Ducere avers that it cannot reasonably construct a pipeline duplicating Mustang's own. Doc. 46 at ¶ 78. And Ducere further alleges that the Mustang pipeline passes near the Chicago Sanitary and Ship Canal, one of the northernmost segments of the United States' navigable waterways, which the Court can infer makes the Mustang pipeline an efficient place for Ducere to build a connecting facility. Doc. 46 at ¶¶ 19, 30. But a facility does not become essential simply because access to it best suits the economic and business needs of a single rival. *Midwest Gas Servs.*, 317 F.3d at 714 (where alternatives were available, pipeline segment that plaintiff

18

desired access to was not essential even if access would have been "the most economical" for plaintiff). And Ducere does not allege anything to show that only the Mustang pipeline would work for its barging facility.

Thus, because it has not established the essentiality of the Mustang pipeline to competitors seeking to provide crude oil transportation services to southern Midwest and Gulf Coast refineries, the Court dismisses Ducere's essential facilities claims.

### C.  Leave to Amend

The Court concludes Ducere has not sufficiently pled its antitrust claims and must now decide whether to leave open the possibility of granting leave to amend. Enbridge asks the Court to dismiss with prejudice, noting that Ducere has already amended once in response to an earlier round of motion to dismiss briefing. Doc. 51 at 3.

Courts should "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). "District courts have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 432 (7th Cir. 2009). Plaintiffs should be given one chance to amend after a motion to dismiss is briefed, even if a plaintiff has amended previously. *Zimmerman v. Bornick*, 25 F.4th 491, 494 (7th Cir. 2022). But if a plaintiff "pleads facts that show its suit is barred … it may plead itself out of court under a Rule 12(b)(6) analysis." *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995).

The Court finds that even with amendment, Ducere's refusal to deal claims would fail. Ducere cannot allege any facts that would satisfy the first *Aspen Skiing* factor, i.e., a "change in a pattern of distribution that had originated in a competitive market and had persisted for several

years." *Viamedia*, 951 F.3d at 456. Ducere's proposal was self-described as a new way to transport crude oil along America's waterways which never actually made it to market. Doc. 46 at ¶¶ 2, 33, 36. And both in its brief and at oral argument, Ducere did not argue that it could plead facts to meet the first *Aspen Skiing* factor. Doc. 57 at 8-9. Similarly, Ducere cannot plead any facts that could meet the second *Aspen Skiing* factor, i.e., Enbridge refusing deals in markets it monopolizes even though it willingly enters those deals in markets where it is not a monopolist. A pipeline-to-pipeline connection is materially different from a pipeline-to-terminal-to-barge arrangement. As such, the Court dismiss with prejudice Ducere's refusal to deal claims brought under federal and Illinois antitrust law.

Ducere's essential facilities claim present a closer call. As explained, Ducere's allegations fall far short of establishing that providers that sell crude oil transportation services to southern Midwest and Gulf Coast refineries cannot compete with Enbridge unless they have access to the Mustang pipeline. Boiled down, this is a failure to allege a plausible market definition and monopoly power. Ducere already amended its complaint once, after Enbridge and former defendants in the case attacked Ducere's market definition in earlier motion to dismiss briefing. *See* Doc. 39 at 5-6. This makes the Court skeptical that another opportunity to amend would resolve these concerns.

But skepticism is not futility. Ducere may have amended its complaint once already, but not with the benefit of the Court's guidance on the underlying antitrust issues. To be clear, the Court hopes Ducere understands that the distance between its current complaint and a version that plausibly states an essential facilities claim is not small. If Ducere decides to file an amended complaint, the Court will expect substantially bolstered allegations about the contours of the market and Enbridge's place in it. That said, the Court can imagine a set of facts which

would allow Ducere to bridge that gap, and so the Court will dismiss Ducere's essential facilities claims without prejudice.

### D. Antitrust Liability for Participants in Joint Ventures

Finally, to briefly address the additional complexity in this case: Enbridge as the sole defendant. It was Mustang—not Enbridge—that refused to consummate the deal with Ducere. And it is a Mustang pipeline—not an Enbridge pipeline—that Ducere alleges is the essential facility in this case. Enbridge is only a part owner of Mustang and all major business decisions had to be approved by all the board members – including the two from ExxonMobil. Doc. 46 at ¶¶ 18, 49.

Enbridge argues that it cannot be held legally responsible for the actions of Mustang, and there is facial appeal to those arguments. Generally speaking, a parent company is not liable for the actions of its subsidiary. *See Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 820 (7th Cir. 2015). Here, Enbridge is not even a true parent given that it holds only a partial stake in Mustang. Ducere needs Enbridge, with its vast network of operated pipelines, to show monopoly power in a relevant market, i.e. the first element of a monopolization claim. But it needs Mustang—the entity that received and ultimately rejected Ducere's business proposal—to establish the willful acquisition, i.e. the second element. The Court is aware of no antitrust case that allowed this sort of splitting of the elements between separate entities (at least, not without having alleged more, like a conspiracy or alter ego theory). To complicate matters more, ExxonMobil also had the right to scuttle the Ducere deal, and thus Enbridge argues that Ducere will not be able to show either that Enbridge caused the injury in this case or that Enbridge would be able to redress it.[2]

---

[2] Ducere has requested in its prayer for relief an injunction requiring Mustang – not Enbridge – to enter into the negotiated agreements. Doc. 46 at 15.

Given that Ducere has not plausibly alleged an actionable refusal to deal or essential facilities claim, the Court does not need to reach these issues now. But the Court urges Ducere to give careful consideration to all of these factors when deciding whether to amend its pleading.

## CONCLUSION

For the foregoing reasons, the Court grants Enbridge's motion. It dismisses Ducere's refusal to deal claims brought under federal and state law with prejudice. It dismisses Ducere's essential facilities claims without prejudice and leave to amend.


Dated: January 13, 2025

_____
APRIL M. PERRY
United States District Judge